858 F.2d 1546
 49 Ed. Law Rep. 529
 Dr. Glennon MAPLES, Dr. Weldon Swinson, Dr. Allen Barbin,
Dr. John Turner, Dr. Winfred Shaw, Plaintiffs-Appellants,
v.
Dr. James MARTIN, individually and as president of Auburn
University; Dr. Warren Brandt, individually and as vice
president of Academic Affairs of Auburn University; Dr.
Lynn Weaver, individually and as Dean of Engineering, Auburn
University; Dr. Malcolm J. Crocker, individually and as
Head of the Mechanical Engineering Department, Auburn
University, Defendants-Appellees.
 No. 87-7553.
 United States Court of Appeals, Eleventh Circuit.
 Nov. 2, 1988.
 
 Julian McPhillips, McPhillips, DeBardelaben and Hawthorne, Montgomery, Ala., for plaintiffs-appellants.
 Ann H. Franke, Washington, D.C., for amicus AAUP.
 T.W. Thagard, Jr., Balch & Bingham, Montgomery, Ala., M. Stanford Blanton, Balch & Bingham, Birmingham, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before RONEY, Chief Judge, JOHNSON and SMITH*, Circuit Judges.
 JOHNSON, Circuit Judge:
 
 
 1
 In 1987, five tenured professors, the appellants,[1] were transferred from the Mechanical Engineering Department ("the ME Department") at Auburn University to other engineering departments at Auburn. In this appeal, they challenge the district court's grant of summary judgment in favor of four members of the University administration, the appellees,[2] after the district court found the appellants' claim that the transfers violated their due process rights under 42 U.S.C.A. Sec. 1983 lacked merit. Additionally, one of the appellants, Dr. Turner, challenges the district court's judgment notwithstanding the verdict in favor of two of the appellees, Drs. Martin and Weaver. Although the jury found that the transfer of Dr. Turner was motivated by an exercise of his First Amendment right to free speech, the district court found that the administrators' interest in the efficient administration of an academic department at a state-sponsored institution outweighed Turner's free speech interest. We affirm.
 
 I.
 
 2
 The transfer of the appellants represents the latest controversy in a department that has been subject to factionalism and in-fighting since the mid-1970's. Since that time, one group, led by the appellants (with the exception of Dr. Turner who is a relative newcomer to the group), has consistently challenged the way the Department has been run. Although it seems clear that the appellants have acted out of genuine concern for what they perceive to be a decline in the quality of the mechanical engineering education provided at Auburn, their efforts to discredit successive Department Heads have been a major source of disruption in the Department over the last decade.
 
 
 3
 In 1983, a search committee was formed to select a new Head for the Department. Appellants campaigned aggressively for the retention of Dr. Swinson, who was at that time serving as acting Department Head. Instead, Dr. Crocker was unanimously recommended by the faculty search committee and became Head of the Department in August 1983. With Dr. Crocker's appointment, tensions again increased as the appellants (joined by Dr. Turner) opposed many of his personnel and administrative decisions. Their disagreement was visible in numerous hostile memoranda and personal confrontations. Specific issues of debate included salaries, allocation of resources, and the "undemocratic" management style of Dr. Crocker.
 
 
 4
 Meanwhile, in the spring of 1986, the ME Department began preparing for an accreditation review by the American Board of Engineering and Technology ("ABET") in the fall.[3] Although the ME Department submitted an official report to ABET in the spring, the appellants formed a "self-study" committee with the purpose of providing additional information to ABET. Using their own funds, they devised and distributed a survey to the ME faculty in August of 1986.
 
 
 5
 Although not all the faculty responded, the results of the survey were published in a report entitled "Mechanical Engineering at Auburn University--a Review" ("the Review"). The Review was distributed to the faculty, students and some alumni and administrators in October 1986. While it contained a discussion of problems such as the critical need for new faculty, additional funding and more physical space, a main concern of the authors was the lack of faculty involvement in administrative decisionmaking and the "morale problem" in the Department. The tone of the Review was extremely critical of the Department Head; one of the appellants admitted that the group hoped the Review would demonstrate that Dr. Crocker "had to go."
 
 
 6
 The Review was also sent to ABET. In November of 1986, ABET responded to the Review, advising Dr. Maples that in their opinion most of the material in the Review discussed personnel and administrative matters, which were unrelated to ABET criteria for accreditation. Defendants' Exhibit 83. After an on-site visit, ABET concluded that the schism in the Department was seriously disrupting the educational process there and affecting faculty in other engineering programs. The visiting team characterized the Review as "academic terrorism" which was aimed at discrediting Dr. Crocker and cited the frequent turnover of Department Heads as evidence that the situation required drastic action.
 
 
 7
 Based on the ABET findings and the recognition that years of in-fighting were injuring the Department, Dr. Martin concluded that reassignment of the appellants was necessary. He therefore approved Dean Weaver's recommendation that the appellants be transferred to other engineering departments.[4] Appellants were notified on November 6, 1986, that their transfers would become effective on January 1, 1987.
 
 
 8
 Although Auburn University provides a grievance procedure for faculty to challenge personnel decisions with which they disagree, none of the appellants initiated such a proceeding. Instead they instituted the present action, charging the appellees with violating the appellants' constitutional rights under 42 U.S.C.A. Sec. 1983. Specifically, they claimed they were transferred in violation of their right to due process as guaranteed by the Fourteenth Amendment and that the transfers were retaliatory in violation of their First Amendment right to free speech. They sought injunctive relief in federal court on December 11, 1986. After an evidentiary hearing, such relief was denied and the appellants' transfers became effective in January 1987.
 
 
 9
 Appellees moved for summary judgment as to both issues on April 3, 1987. The district court granted the motion in part, denying the appellants relief on their due process claim. On April 27, 1987, the trial commenced on the First Amendment issue. At the conclusion of the evidence, the court entered directed verdicts in favor of appellees Brandt and Crocker in their official capacities. The court also entered directed verdicts in favor of all four appellees in their individual capacities on the basis of qualified immunity. However, the trial court denied the motions of Martin and Weaver in their official capacities for a directed verdict, leaving them as the only remaining defendants in the suit. The case was then submitted to the jury on special interrogatories with respect to the appellants' claim for reinstatement. The jury found that the Review was a substantial or motivating factor only in the decision to transfer appellant Turner and that he would not have been transferred had he not participated in the Review. The jury also found that Maples, Shaw, Swinson and Barbin did not prove, by a preponderance of evidence, that their activity in preparing the Review was a substantial or motivating cause of their transfer. Accordingly, the court entered judgment in favor of Turner on his First Amendment claim and for Martin and Weaver on the First Amendment claims of the other four appellants. The trial court then granted Martin and Weaver's motion for judgment notwithstanding the verdict as to Turner's claim, holding that, as a matter of law, the Review did not deal with a matter of public concern and that the challenged speech had a high tendency of disruption which had compromised the Department's ability to carry out its public duties.
 
 II.
 
 10
 The appellants argue that the district court erred in granting summary judgment for the appellees on the due process claim. The appellants contend that they were deprived of two protected property interests without due process of law. This Court's review of a grant of summary judgment is plenary, and we apply the same legal standards that bound the district court. Livernois v. Medical Disposables, Inc., 837 F.2d 1018, 1022 (11th Cir.1988).
 
 
 11
 Appellants claim two property interests. First, they assert that they have a property interest in "the freedom to criticize and advocate change." They claim that this interest derives from a statement in the Faculty Handbook that Auburn University subscribes to the principle of "academic freedom." The "right" to present critical views in a university setting does not necessarily rise to the level of a property interest as defined by the Supreme Court, and appellants have presented no cases or further argument to support their novel theory. See Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (person claiming property interest must have more than "abstract need" or "unilateral expectation" of it).
 
 
 12
 The appellants next argue that they have an entitlement to continued assignment in the ME Department. They claim that there is an implied understanding at Auburn University that faculty members will not be transferred from one department to another against their will. As support for their argument, they look to the Supreme Court's discussion of implied property rights in the job termination context. The Supreme Court has held that, absent an explicit contractual provision guaranteeing no dismissal without cause, a plaintiff may still be able to show from the circumstances of his service that he has a claim of entitlement to job tenure. Perry v. Sinderman, 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972).
 
 
 13
 The analogy to the job termination context is not determinative. Transfers and reassignments have generally not been held to implicate a property interest. See Volk v. Coler, 845 F.2d 1422, 1430 (7th Cir.1988) (plaintiff has no property interest in employment at particular office of state welfare agency); Garvie v. Jackson, 845 F.2d 647, 651 (6th Cir.1988) (no property interest at issue when Department Head reassigned to regular teaching duties); Childers v. Independent School Dist., 676 F.2d 1338, 1341 (10th Cir.1982) (tenured teacher has property interest in continued employment but not in particular assignment); Kelleher v. Flawn, 761 F.2d 1079, 1087 (5th Cir.1985) (reappointment of non-tenured faculty member with concurrent reduction of teaching duties does not deprive plaintiff of property interest). The transfers at issue in this case did not result in any diminution of salary or rank. All the appellants were able to continue teaching in their area of specialization, albeit for different departments.[5] Appellants have not cited any provision of the Faculty Handbook or any provision of Alabama state law which provides that a college professor may not be transferred to another department without his consent. Cf. Hatcher v. Bd. of Public Educ. and Orphanage for Bibb County, 809 F.2d 1546, 1549-52 (11th Cir.1987) (property right to comparable reassignment derived from operation of Georgia law and not from conduct or alleged policy of Board of Education). As in Roth, it would seem that this is the sort of administrative decision that is left completely to the administration's discretion. See Roth, 408 U.S. at 566-67, 92 S.Ct. at 2703-04 (no statutory or administrative standards for rehiring of non-tenured teacher, so left to "unfettered discretion of university officials").
 
 
 14
 Even assuming the Court were to find a protected property interest that gave the appellants a right not to be transferred against their will, they cannot be said to have been denied procedural due process.[6] On November 6, 1986, the appellants were notified in writing of the appellees' intention to transfer them on January 1, 1987. Thus, they were given adequate notice of the transfers. Additionally, the Faculty Handbook establishes a grievance procedure which satisfies the requirement of due process.[7] See Stewart v. Bailey, 556 F.2d 281, 285 (5th Cir.1977) (describing "four requirements necessary to afford minimal due process to a teacher").
 
 
 15
 The appellants failed to avail themselves of this procedure and presented no evidence that resort to it would have been futile.[8] Thus, an opportunity to be heard that would have met the requirements of due process was lost to the appellants by their own inaction. See Fetner v. Roanoke, 813 F.2d 1183, 1186 (11th Cir.1987) (employee who opts to resign rather than face public hearing cannot claim denial of due process); Lewis v. Hillsborough Transit Auth., 726 F.2d 664, 667 (11th Cir.1983), cert. denied, 469 U.S. 822, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (employee who declines to utilize grievance procedure that meets constitutional standards cannot claim denial of opportunity to rebut charges against him).
 
 
 16
 The appellants have not demonstrated that they were deprived of a constitutionally protected property interest. Even if they could prove the existence of such an interest, they were still provided with notice and a grievance procedure which they chose not to pursue. The district court was correct in granting summary judgment for the appellees.
 
 III.
 
 17
 Appellant Turner challenges the district court's judgment notwithstanding the verdict in favor of the appellees. He claims that his transfer was made in retaliation for his participation in producing the Review. He claims that the Review addressed a matter of public concern--the quality of education provided by Auburn's ME Department--and that it is constitutionally protected speech. The appellees argue that the district court was correct in finding that the Review is concerned exclusively with internal departmental affairs and personal grievances, thus placing it outside the scope of constitutional protection. The status of Turner's speech is a question of law and a reviewing court is therefore not bound by the trial court's conclusions regarding the facts. Connick v. Myers, 461 U.S. 138, 150 n. 10, 103 S.Ct. 1684, 1692 n. 10, 75 L.Ed.2d 708 (1983).
 
 
 18
 This Court has held that three issues must be addressed in assessing a claim of unfair retaliation against a public employee who asserts First Amendment protection. Hatcher, 809 F.2d at 1556 n. 19. First, the Court must determine whether the employee's speech can be fairly characterized as implicating a matter of "public concern." If so, the speech is constitutionally protected. Second, the plaintiff must show that the speech was a "substantial or motivating factor" in the employment decision. Third, when both these showings have been made, the Court will apply the balancing test set out in Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), to determine "whether the adverse employment decision was justified." Ferrara v. Mills, 781 F.2d 1508, 1512 (11th Cir.1986).[9] In Pickering, the Supreme Court stated that the state's interest as an employer requires that the courts "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. 391 U.S. at 568, 88 S.Ct. at 1734. This decision reflects the "common-sense realization that government offices could not function if every employment decision became a constitutional matter." Connick, 461 U.S. at 143, 103 S.Ct. at 1688. Because the jury found that publication of the Review was a substantial or motivating factor in the decision to transfer Turner, this Court need address only the first and third issues.[10]
 
 
 19
 Many courts have discussed what constitutes a matter of public concern in the educational setting. Following the Supreme Court's distinction in Connick between subjects of private and public interest,[11] courts have found speech that concerns internal administration of the educational system and personal grievances will not receive constitutional protection. For example, in Ballard v. Blount, 581 F.Supp. 160 (N.D.Ga.1983), aff'd, 734 F.2d 1480 (11th Cir.), cert. denied, 469 U.S. 1086, 105 S.Ct. 590, 83 L.Ed.2d 700 (1984), the district court held that the plaintiff's critical comments regarding salary levels, his course assignments, a proposed course syllabus, and tenure decisions involved "matters relating to internal college affairs rather than to matters of political or social import--matters of public concern." 581 F.Supp. at 164. See also Ferrara, 781 F.2d at 1516 (teacher's complaints about manner of course registration and course assignments are unprotected speech); Renfroe v. Kirkpatrick, 722 F.2d 714, 715 (11th Cir.), cert. denied, 469 U.S. 823, 105 S.Ct. 98, 83 L.Ed.2d 44 (1984) (teacher's expressed unwillingness to "job share" is unprotected speech); Hesse v. Bd. of Educ. of Township High School Dist. No. 21, 848 F.2d 748, 752 (7th Cir.1988) (memoranda discussing teaching methods and criteria of evaluation are unprotected speech).
 
 
 20
 However, teachers whose speech directly affects the public's perception of the quality of education in a given academic system find their speech protected. See, e.g., Pickering, 391 U.S. at 571, 88 S.Ct. at 1736 (issue of "whether a school system requires additional funds is a matter of legitimate public concern"); Honore v. Douglas, 833 F.2d 565 (5th Cir.1987) (law school admission's policy and size of student population are matters of public concern); Southside Public Schools v. Hill, 827 F.2d 270, 273 (8th Cir.1987) (failure to execute federally mandated programs for handicapped students is issue of public concern); Johnson v. Lincoln Univ., 776 F.2d 443 (3rd Cir.1985) (educational standards and accreditation are matters of public concern). Further, the Supreme Court has held that even a document that "touch[es] upon matters of public concern in only a most limited sense" should be considered protected speech. See Connick, 461 U.S. at 154, 103 S.Ct. at 1693-94 (one question out of fourteen touching matter of public concern is adequate to invoke constitutional protection for plaintiff's questionnaire).
 
 
 21
 Our examination of the document in this case leads us to conclude that the Review, while critical of the way the ME Department has been managed by the Department Head, also involves substantive issues that could influence the public's perception of the quality of education provided by the Department. Specifically, the Review points to weaknesses in the curriculum, inadequate facilities, a low faculty-to-school ratio and the poor performance of Auburn graduates on the professional licensing exams for engineers, all of which endanger the ability of the Department to prepare students for professional engineering careers. The authors repeatedly emphasize their concern that the Department's accreditation is in jeopardy because of these problems. The status of an academic department's accreditation is the type of subject usually held to be of interest to the general public. See Johnson, 776 F.2d at 452 (letters to accreditation agency generally will touch upon matters of public concern).
 
 
 22
 At least part of the motivation for appellant Turner and the other authors in publishing the Review was to alert both the administration and other interested parties of the problems the Department was facing in providing Auburn students with an adequate engineering education.[12] Speech by members of an academic community, even when critical in nature, should not be easily denied constitutional protection. See Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 222 (1969) (First Amendment rights should be evaluated "in light of the special characteristics of the school environment"). We decline to hold as a matter of law that the Review did not discuss issues of interest and concern to the general public. Having reviewed the document at issue in terms of its content, form, and context, see Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690, we conclude that the appellants were sincere in their efforts to alert the public to the conditions of Auburn's ME Department, even if that concern was co-mingled with criticism of the Department Head's management style.
 
 
 23
 Having determined that the Review contains some constitutionally protected speech, we turn to the Pickering test. Pickering requires the Court to balance the rights of public employees to speak on matters of public concern with the government's need to maintain the efficient performance of the public service it provides. Although such a balancing must occur case-by-case, the Supreme Court has discussed a number of factors to be considered in the analysis. The Court should review the time, place and manner of the speech as well as the context in which the dispute between the parties arose. Rankin v. McPherson, --- U.S. ----, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987). Other factors to be considered are "[w]hether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 107 S.Ct. at 2899 (citing Pickering, 391 U.S. at 570-573, 88 S.Ct. at 1735-1737). In assessing these factors, this Court has recognized that the entire document at issue must be weighed against its disruptive impact on the workplace. Eiland v. Montgomery, 797 F.2d 953, 957 (11th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).
 
 
 24
 Taking all these factors into account, this Court concludes that the Review's interference with the efficient operation of the ME Department at Auburn was sufficient to justify the transfer of appellant Turner. The Review, which contained repeated statements characterizing the Department Head as dictatorial and inflexible, was produced on the eve of the ABET's accreditation visit and distributed widely. By subjecting internal administrative policies to public scrutiny, it distracted both students and faculty from the primary academic tasks of education and research.[13]
 
 
 25
 Further, the Review was produced in an atmosphere of tension created by the authors' longstanding grievance that they were not being sufficiently involved in departmental decisionmaking.[14] Comments that occur in the context of a longstanding dispute over internal policies have been held to justify drastic administrative action. See Hesse, 848 F.2d at 753 (deteriorating employment relationship which had been developing over five year period justifies school administration's decision); Derrickson, 738 F.2d at 352-53 (teacher's "frequent, lengthy and uncompromising criticisms" of administration, faculty and students compromised efficient operation and harmony of school environment); see also Connick, 461 U.S. at 152, 103 S.Ct. at 1692 (because employers must act to avert crises, probability of future disruption may be considered). The publication of the Review contributed to a lack of harmony among the faculty and interfered substantially with the regular operation of the ME Department. It severely hampered communication between members of the faculty and the Department Head. See Morales, at 1149 (plaintiff's statements, "effectively cutting off communication" between the parties, and producing atmosphere of mistrust, outweighed by government interest in efficient running of government program). Given these facts, we find that appellees Martin and Weaver have met their burden of showing that the transfer of appellant Turner was necessary to allow for the efficient administration of the ME Department. Thus, the district court judge was correct in granting a judgment notwithstanding the verdict in favor of Martin and Weaver.
 
 IV.
 
 26
 As the five appellants have not demonstrated a property interest violated by their transfers which would entitle them to the protection of procedural due process, the district court judge was correct in granting summary judgment for the four appellees on the due process claim. As to the only remaining First Amendment claim, presented by appellant Turner, we hold that the Review addresses a matter of public concern--the quality of education provided by a state-sponsored institution--but that the interest of Drs. Martin and Weaver in the orderly administration of the ME Department outweighs Dr. Turner's interest in speaking on this issue in light of the facts of this case. Accordingly, we AFFIRM the district court.
 
 
 
 *
 Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 The appellants are Dr. Glennon Maples, Dr. Winfred Shaw, Dr. Frank Swinson, Dr. Alan Barbin and Dr. John Turner
 
 
 [2]
 The appellees are Dr. James Martin, President of Auburn University; Dr. Warren Brandt, Vice President for Academic Affairs; Dr. Lynn Weaver, former Dean, College of Engineering; and Dr. Malcolm Crocker, Head, Department of Mechanical Engineering
 
 
 [3]
 ABET is the primary accrediting body for schools of engineering in the United States
 
 
 [4]
 One of the appellants, Dr. Turner, was transferred to the Agricultural Engineering Department which was in the Department of Agriculture. The others were transferred within the College of Engineering. None of the appellants suffered any loss of income, rank, or tenure as a result of the transfers. A sixth author of the Review, Dr. Dyer, was not transferred
 
 
 [5]
 Appellants also claim that they suffered a "reputational loss" as a result of the transfers. Presumably, they mean to suggest that they have been deprived of a constitutionally protected liberty interest. However, they have not demonstrated that their transfers were "attended by stigmatizing changes which 'might seriously damage [their] standing and association with [their] community' or foreclose '[their] freedom to take advantage of other employment opportunities.' " Sullivan v. School Bd. of Pinellas County, 773 F.2d 1182, 1187 (11th Cir.1985) (citation omitted)
 
 
 [6]
 The appellants also claim that they were denied substantive due process because they were dismissed for exercising their First Amendment right to free speech without being warned that their activities might result in action by the administration. They cite Parducci v. Rutland, 316 F.Supp. 352, 357 (M.D.Ala.1970), for the proposition that "no person should be punished for conduct unless such conduct has been proscribed in clear and precise terms." In Parducci, the plaintiff was dismissed for assigning a short story which offended school officials. The dismissal was deemed arbitrary and fundamentally unfair by the district court. The appellants in this case were given ample warning over the last ten years that their conduct was disrupting the normal functioning of the ME Department. They cannot now claim that they had no knowledge that their actions might precipitate administrative action. Therefore, Parducci is completely inapplicable to this case
 
 
 [7]
 Article VI, Section 2(a), gives faculty members the right to pursue a grievance process. Article VI, Section 5, sets out the process which includes a series of meetings with the employee's supervisors, followed if necessary by an evidentiary hearing before a panel of faculty members selected jointly by the administration and the employee. The grievance committee has 30 days, after the close of formal hearings, to make a recommendation to the President, and he then has 60 days in which to make a final decision
 
 
 [8]
 The appellants' claim that the length of the grievance process would result in their actual transfer before the process was completed is speculative. There is no reason to conclude that the grievance committee and the President could not make their decisions before the date of the transfers. Even if the process was not completed by the date of transfer, the appellants would have had a chance to address the charges against them. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985) (pretermination hearing "need not definitively resolve the propriety of the discharge" when post-termination appeals are available)
 
 
 [9]
 While the plaintiff bears the burden of proving that the speech addresses a matter of public concern, the governmental employer bears the burden of justifying the discharge. Morales v. Stierheim, 848 F.2d 1145, 1147 (11th Cir.1988)
 
 
 [10]
 The causation issue is a factual question, Waters v. Chaffin, 684 F.2d 833, 837 n. 10 (11th Cir.1982), and the jury findings in this case are amply supported by the evidence
 
 
 [11]
 "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick, 461 U.S. at 147, 103 S.Ct. at 1690
 
 
 [12]
 This Circuit has stated that plaintiffs should not be allowed to "bootstrap" a personal grievance into an issue of public concern by general references to "popular interest in the way public institutions are run." Ballard, 581 F.Supp. at 163 (citing Mahaffey v. Kansas Bd. of Regents, 562 F.Supp. 887, 890 (D.Kan.1983)); Ferrara, 781 F.2d at 1516; see also Hesse, 848 F.2d at 752 (employee's motivation in speaking should be considered)
 
 
 [13]
 The ABET sent an evaluation to the ME Department on Feb. 17, 1987, in which it discussed the findings of its visiting team in the fall of 1986. In the evaluation, the ABET observed that the schism in the faculty produced by the Review and the attempts to bring undergraduate students into the controversy had noticeably interfered with normal educational processes. The observers also noted that the "deplorable situation in [the Department] ... is affecting other faculty in other engineering programs," Plaintiff's Appendix II at 3, and counseled that "this program requires immediate correction before further damage occurs to the engineering programs at Auburn University." Id. at 4
 
 
 [14]
 Appellant Turner maintains that his status as a relatively new member of this dissatisfied faction prevents the Court from considering the history of acrimonious relations between this group and successive Department Heads. However, Turner's willingness to work with the others and take on substantial responsibility in producing the Review (he authored one of the sections) implies that he was willing to take the consequences of being visibly associated with them. Certainly, he was well aware that their grievances about the lack of faculty participation in departmental decisionmaking had a long history