**Neil J. FARKAS, D.O., Plaintiff,**

v.

**Barbara ROSS–LEE, D.O. and Myron Magen, D.O., jointly and severally, Defendants.**

**No. L87–69–CA5.**

United States District Court, W.D. Michigan, S.D.

Jan. 30, 1989.

Portnoy, Leader, Pidgeon & Roth by Robert P. Roth, Bloomfield Hills, Mich., for plaintiff.

Office of the General Counsel, Michigan State University by Michael J. Kiley, East Lansing, Mich., for defendants.

## OPINION

ROBERT HOLMES BELL, District Judge.

Before this Court is defendants' motion for summary judgment on plaintiff's complaint alleging deprivation of constitutionally protected property and liberty interests without procedural due process in violation of 42 U.S.C. § 1983. Plaintiff's claim arises out of his transfer from one teaching post to another by defendants without prior notice or hearing as required by the academic institution's internal bylaws.

## I. BACKGROUND

In late 1986 Neil J. Farkas, D.O., ("Farkas") sold his private medical practice to join the Michigan State University ("MSU"), College of Osteopathic Medicine ("COM"). Farkas had negotiated his employment at the MSU/COM with Barbara Ross–Lee, D.O., ("Ross–Lee"), Chairman of the Department of Family Medicine ("DFM"), and Myron Magen, D.O., ("Magen"), Dean of the MSU/COM. Farkas accepted an offer of employment on January 15, 1987, to be effective January 7, 1987. Farkas assumed his position on February 7, 1987. The terms of his employment were:

1. Full-time tenure track position at the rank of Assistant Professor in the DFM with a three year probationary period.

2. Annual base salary of $50,000 effective January 7, 1987.

3. Health service related compensation component to generate $20,000 annually.

4. Farkas was required to participate in teaching, clinical practice with students, family medicine clinic, classroom teaching, small group teaching, research and scholarly activity, curriculum planning, committee activity, administrative assignments, and DFM clinical hospital coverage.

For several years before Farkas arrived the COM and the DFM experienced problems with the quality of care and administrative competence at various clinics that the DFM staffed in the Lansing community. One of the reasons Farkas was hired was to alleviate this deficiency. However, it appears from the pleadings, motions, and supporting documents that serious personnel problems also were developing. Shortly after Farkas began working he expressed his concern over the clinical care provided by members of the DFM in the various COM clinics in Lansing, the competency of Ross–Lee's administration of the DFM, and his proposed assigned duties in obstetrical care.

Farkas wrote several antagonistic and acrimonious letters addressed to Ross–Lee, DFM Chairperson; Magen, COM Dean, and Scott, MSU Provost. In a letter dated April 9, 1987, addressed to Magen, Farkas writes:

This letter is one that I hope will deserve your attention and prompt communication. In no uncertain terms, I want you to know that I am angry, and presently bitter, over the situation in the Department of Family Medicine, an with the LACK of integrity, honesty and professionalism of the present chairperson, namely Barbara Ross–Lee, D.O. . . .

As you know (we have discussed this openly at lunch previously), the situation at Ingham County, Adult Health, is one filled with malpractice, open negligence, and lacking in morality or ethical conduct.

In a letter dated April 14, 1987, addressed to Ross–Lee, which Farkas claims was stolen from his desk and distributed without his permission, Farkas wrote:

I believe that you need to do some soul searching, relative to the manner in which you have conducted yourself (i.e. Ingham County Adult Health). Clearly, YOU SOLD ME OUT, PER THE INTERACTION WITH MAX COOK, M.D., and further, YOU FAILED TO DEFEND ME AND NEVER SUPPORTED MY POSITION. More importantly, YOU COMPROMISED PATIENT CARE, PATIENT SAFETY, STANDARD OF CARE AND CONTINUITY OF CARE, FOR YOU CALL, 'POLITICAL MOTIVE.' You have said, 'I can't talk to you about the politics and maneuvers over there; you won't understand and [sic] what is at stake.' I suggest to you, without hesitation, that you look to yourself for the truth in this matter. I'm not certain that someone who places 'political motive' over patient care and safety, has the ability to recognize and deal with the truth. Your motive, regardless of the politics, is clearly immoral, unethical, and not supportive of the patients, students, residents or faculty, who seek medical care and education. YOU HAVE BROKEN THE LINES OF COMMUNICATION, BY PORTRAYING THE TRUTH AS LIES, AND BY SACRIFICING PERSONAL AND PROFESSIONAL ETHICS, FOR WHAT I THINK AMOUNTS TO ABOUT $30.00 PER HOUR.

Your lack of integrity and credibility is certainly reflected in memo # 2.... Apparently, you now acknowledge that Arlene was in fact given the weekend off, per your instructions. As per your memo today, 'I, obviously was mistaken,' is nothing more than a poor and ineffective excuse for what amounted to a lie on Friday, April 10.... The TRUTH of the matter is that your office is administratively ineffective and mismanaged ...

. . . .

I could now indulge myself with your remarks about the competency of the department by citing statements like,

'don't worry about it, you have unlimited malpractice coverage here.' Very nice. No wonder the Department of Osteopathic Medicine, as well as the University and off campus medical people hold us in such high esteem.

. . . .

Honesty and effective TRUTHFUL communication is the solution to a department which can be strong and productive. Lies and cover-up only mask the incompetence and lack of effective leadership, which has plagued the department in the past.

In a letter dated May 1, 1987, addressed to Provost Scott, Farkas writes:

Clearly, I have been victim of a stepwise, progressive, calculated and premeditated attack by arrogant, egotistic megalomaniacs who seek to deprive human beings of civil rights and constitutional freedoms, when statements of fact and truth upset their political agendas. It is my hope that the arrogance, egotism and gross clinical and administrative incompetence, which has previously been brought to the attention of the University Administration (ie. President, Provost and MSU Board of Trustees), by other concerned, well-meaning faculty, can be properly viewed in light of the truth.

Further, as attested in unrefuted affidavits, Farkas conducted himself in a manner disruptive of the orderly and regular operation of the DFM at various clinical locations by verbally attacking the department, its management, and its employees. *See* Affidavits of Susan Hinshon, R.N., Pamela Chiodini, R.N., Linda High, R.N., and Arlene Smith, D.O. A particularly egregious example of his verbal attacks is attested in an unrefuted affidavit of Edward K. Lee, in which Farkas is alleged to have said, referring to Ross–Lee, "She's nothing but a nigger anyway."

On April 20, 1987, Farkas met with Ross–Lee and two senior faculty members, James Potchen, M.D., and Donald Williams, M.D. Both Potchen and Williams suggested that Farkas resign. During the meeting

Farkas' mental stability was also questioned. On April 22, 1987, at an Executive Committee meeting Ross–Lee indicated that she was transferring Farkas to the Community Health Science Department ("CHSD") because Farkas was "driving her crazy" and she could no longer put up with him. Further, Ross–Lee characterized Farkas as "mentally unstable" and as a "paranoid schizophrenic." Ross–Lee also indicated that Farkas kept records on each member of DFM and characterized DFM members as incompetent. Additionally, Ross–Lee stated that Farkas had "corrupted" two DFM residents.

In a memo dated April 23, 1987, Ross–Lee informed Farkas that his appointment had been changed from the DFM to the CHSD relieving him of all duties in the DFM. Ross–Lee effected the transfer without consulting the chairperson of the CHSD, without a vote of the DFM executive meeting, and without the consent of Farkas.

After being informed of the transfer, Farkas consulted with MSU Provost David Scott ("Scott") and discussed his transfer by Ross–Lee. On May 4, 1987, Scott met with Magen and indicated that Farkas' transfer violated standard MSU operating procedures in departmental transfers. On the same day Magen reinstated Farkas to the DFM. Thereafter, Ross–Lee assigned Farkas to clinical duties at the MSU Clinical Center rather than at the locations where he had been previously assigned.

On May 21, 1987, at a DFM faculty meeting, Ross–Lee indicated that Provost Scott ordered a departmental audit prompted by Farkas' criticisms of faculty competence. Ross–Lee also alleged that Farkas carried a tape recorder on his person and had secured legal counsel.

In June 1987, Farkas resigned his employment effective June 12, 1987. On November 3, 1987, Farkas filed this complaint under 42 U.S.C. § 1983 alleging that his procedural due process rights were violated by his intra-departmental transfer.

## II. ANALYSIS

In his amended complaint (par. 27) Farkas has alleged violation of his procedural due process rights by denial of his alleged protected property rights in his position in the DFM without prior notice and hearing and without benefit of the usual MSU procedures under the Medical Staff By–Laws for transfer of professors between departments. Farkas also has alleged (par. 28) that his removal from the Department of Family Medicine and his subsequent treatment upon reinstatement in the department deprived him of his liberty interest by stigmatizing him and disadvantaging him in other employment opportunities.

Defendants have moved for summary judgment asserting reliance on the legal arguments advanced in their brief for their motion to dismiss, including dismissal pursuant to F.R.Civ.P. 12(b)(6) and qualified immunity, and advancing the theory that Farkas' presence and conduct in the department was sufficiently disruptive of the regular and ordinary operation of the DFM to justify Farkas' transfer from the DCHS. Although this Court denied defendants' earlier motion to dismiss, this Court will entertain the arguments presented there in deciding this motion under F.R.Civ.P. 56.

## A. DUE PROCESS

The Due Process Clause protects against the deprivations of "life, liberty or property without due process of law." The Due Process Clause is a major limitation on government agencies which affect the "liberty" and "property" interests of individuals. In *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court adopted a two-stage analysis to evaluate claims that state action has violated an individual's rights without due process of law. First, a court must determine whether a *constitutionally* protected interest in life, liberty, or property exists. Second, assuming that a constitutionally protected interest is implicated, a court must determine what procedural safeguards are required. The second stage of the analysis requires the reviewing court to weigh the relative importance of three factors: (1) the private interest involved, (2) the risk of erroneous impairment of the interest and

the value of particular procedural safeguards to protect the interest, and (3) the government's interest relative to the burden that particular procedural safeguards impose on its financial and administrative efficiency.

### 1. The Existence and Character of the Property Interest

■ Public employees who have legitimate expectations of continued government employment possess property interests. Such protected property interests in employment are created and defined by "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, at 577, 92 S.Ct. 2701, at 2709, 33 L.Ed.2d 548 (1972). *See Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). However, a "person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must have a legitimate claim of entitlement to It." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Further, under the Fourteenth Amendment this "procedural protection of property is a safeguard of the security interests that a person has already acquired in specific benefits." *Roth*, at 576, 92 S.Ct. at 2708.

■ Not every contractual right a public employee has as a term and condition of the employment relation is constitutionally actionable in federal court. Rather, it varies with the specific term and the particular conditions under which they are exercised. As the court in *Yatvin v. Madison Metropolitan School Dist.*, 840 F.2d 412, at 416 (7th Cir.1988), has stated:

"The due process clauses of the Fifth and Fourteenth Amendment do not entitle a person to a federal claim for every breach of contract by a state or federal agency. If they did, every breach of every public contract would be actionable in federal court.... Thus, unless every

breach of every public contract is to be actionable as a violation of constitutional rights, it is necessary to distinguish between 'mere' contract rights and property rights created by contracts." (citations omitted)

In the context of public academic employment, courts applying procedural due process analysis to alleged property rights, have distinguished between terminations and lesser personnel actions. In *Mahaffey v. Kansas Board of Regents*, 562 F.Supp. 887 (D.Kan.1983), a tenured professor alleged that his colleagues assigned him against his will to a newly organized department and when he objected to the transfer they retaliated against him by denial of merit increases, removal as chair of the curriculum committee, removal as departmental teaching leader, reduction of teaching assignments from twelve to nine months, relocation to a smaller office, and loss of control over certain equipment. The court refused to recognize a constitutionally protected property interest in the tenured professor's claimed entitlement, reasoning: "If plaintiff's argument held sway, then every public employer would have a protected property interest not only in continued employment but in every condition, however trivial."

Courts have recognized interdepartmental transfers of public employees as lesser personnel actions with lesser protections as compared to terminations. In *Maples v. Martin*, 858 F.2d 1546 (11th Cir.1988), five *tenured* professors, who were transferred from one engineering department to another engineering department, brought suit under § 1983 claiming violations of their due process rights. The *Maples* court analyzed the claim distinguishing terminations and transfers, reasoning:

The appellants next argue that they have an entitlement to continued assignment in the ME [mechanical] Department. They claim that there is an implied understanding at Auburn University that faculty members will not be transferred from one department to another against their will. As support for their argument, they look to the Supreme

Court's discussion of implied property rights in the job termination context.

.   .   .   .   .

The analogy to the job termination context is not determinative. Transfers and reassignments have generally not been held to implicate a property interest. . . . The transfers at issue in this case did not result in any diminution of salary or rank. All the appellants were able to continue teaching in their area of specialization, albeit for different departments. Appellants have not cited any provision of the Faculty Handbook or any provision of Alabama state law which provides that a college professor may not be transferred to another department without his consent ... As in *Roth*, it would seem that this is the sort of administrative decision that is left completely to the administration's discretion. (citations omitted)

*Maples*, at 1550–51. Moreover, transfers may be especially appropriate as a matter of practical internal college administration where those who are transferred present an impediment to the regular functioning of the department. In *Maples*, one of the transferred professors also had authored a document highly critical of the department head with whom he had a long-standing grievance. In addition to an alleged due process violation, he challenged his transfer on First Amendment grounds. The *Maples* court relied on the analysis and balancing test provided in the cases of *Connick v. Meyers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); and *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987). The *Maples* court stated:

Other factors to be considered are "[w]hether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."

*Rankin*, 107 S.Ct. at 2899 (citing *Pickering*, 391 U.S. at 570–573, 88 S.Ct. at 1735–1737). In assessing these factors, this Court has recognized that the *entire document* at issue must be weighed against its disruptive impact on the work place. *Eiland v. Montgomery*, 797 F.2d 953, 957 (11th Cir.1986), *cert. denied*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).

Taking all these factors into account, this Court concludes that the Review's interference with the efficient operation of the ME Department at Auburn was sufficient to justify the transfer of appellant Turner.

*Maples*, at 1554.

In addition to distinguishing between terminations and transfers, courts further acknowledge that not every injury to an alleged property interest rises to the level of a constitutional violation. In *Samad v. Jenkins*, 845 F.2d 660 (6th Cir.1988), a professor brought a § 1983 action over his denial of emeritus status. Recognizing that a personnel action must substantially and materially impair an employee's status, the *Samad* court stated:

We believe there must be a substantial, tangible harm and a material change to an employee's status before the employee possesses a viable § 1983 cause of action based upon the fourteenth amendment. We cannot find anywhere in the record where Samad has alleged that the University or Jenkins took any steps that significantly and materially impaired plaintiff's agreed employment status.

In the present case preemployment correspondence between Ross–Lee and Farkas and the appointment recommendation form indicate that he was appointed as an Assistant Professor in the DFM of the COM under a three year, probationary, tenure track contract. Accordingly, Farkas had a legitimate contractual expectation of continued employment for three years in the COM.

However, Farkas claims a property interest is his *continued appointment in the DFM*, free from transfer to another department without due process. This Court is

not convinced that an interdepartmental transfer implicates a constitutionally protected property interest, even where, in this case, the university appointment recommendation form specified Farkas' position in the DFM. Despite the fact that Farkas styles Ross–Lee's administrative action as a "firing" or "termination," it was merely an interdepartmental transfer. Ross–Lee transferred Farkas from the DFM to the DCHS, both of which are departments within the COM. The transfer was merely temporary until Farkas was retransferred back into the DFM by order of Provost Scott. During the brief ten day transfer Farkas was still a professor, only he was in the DCHS rather than the DFM. No indication exists that his salary was reduced during that period or that he was demoted from his rank of assistant professor. The brief duration of Farkas' transfer represents only a negligible impairment, if any, of Farkas' property interest, if one exists. The brief temporal impairment of Farkas' protected property right in his appointment to the DFM was not a "sufficiently substantial, tangible harm and a material change in his employment status" to allege a viable § 1983 cause of action. Accordingly, this Court determines that Farkas did not possess a constitutionally recognized property interest in his appointment to the DFM, as opposed to any subsequent reassignment or transfer to another department within the COM.

Further, Farkas' acerbic and rancorous criticism of the department, its faculty, and chairperson unquestionably had a disruptive impact on the DFM. Farkas' broad charges of ubiquitous incompetence, inefficiency, and malice did not promote salutary working conditions under which medical education and clinical services could be regularly, orderly, and efficiently provided. Without assigning culpability to the various participants in this debilitating departmental debacle, no genuine issue of fact exists as to whether discipline, harmony, and confidence among coworkers was undermined impairing the regular operation of the DFM.

## 2. The Liberty Interest

■ Courts have recognized three general types of liberty interests protected by due process. They are physical freedom, the exercise of fundamental constitutional rights, and various forms of freedom of action and choice. In *Board of Regents v. Roth*, 408 U.S. 564, at 572, 92 S.Ct. 2701, at 2706, 33 L.Ed.2d 548 (1972) *quoting Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the Court stated:

[Liberty] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge ... and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men.

Where a government employee has a recognized property interest in continued employment, dismissal of the employee may implicate liberty interests. In *Roth* the Court discussed this issue:

The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so this would have been a different case. For, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." (citations omitted). In such a case, due process would accord an opportunity to refute the charge before University officials. In the present case, however, there is no suggestion whatever that the respondent's interest in his "good name, reputation, honor, or integrity" is at stake.

Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to

bar the respondent from all other public employment in state universities. Had it done so, this again, would be a different case.

The Court explained, in a footnote, the "name clearing" character and purpose of the due process required when this liberty interest is impaired.

> The purpose of such notice and hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons.

*Roth*, 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12.

The Sixth Circuit has refined this liberty interest analysis in *Lake Michigan College Federation of Teachers v. Lake Michigan Community College*, 518 F.2d 1091 (6th Cir.1975). In *Lake Michigan* the college discharged teachers for illegally striking. The teachers sued claiming impairment of their liberty interest arguing that termination for an illegal strike would stigmatize them and impair their professional standing. The court stated:

> [I]t appears that due process safeguards would apply if the discharge of a teacher foreclosed future employment opportunities that otherwise would be open to him or if the grounds for the discharge tend to discredit the teacher's honesty or integrity or to damage his standing in the community.

*Lake Michigan*, at 1096. After reviewing the record the court found nothing "to indicate that by discharging the striking faculty, the College foreclosed other employment opportunities that were available to them." The court further provided a standard requiring a "showing that a definite range of opportunities" is foreclosed:

> To be sure, plaintiffs lost their positions at the College, which may have made them less attractive to other employers, but in and of itself this does not amount to a deprivation of liberty. [citing *Roth*] Plaintiffs have made no showing that a definite range of opportunities is no longer open to them, and accordingly their

liberty has not been restricted within the meaning of *Roth*.

*Lake Michigan*, at 1097–98. *See Garvie v. Jackson*, 845 F.2d 647, 652 (6th Cir.1988).

■ In the present case Farkas has failed to plead and demonstrate the existence of a genuine issue of material fact that a "definite range of opportunities is no longer open" to him. Accordingly, his liberty interest in employment freedom has not been restricted within the meaning of *Roth*. Moreover, under *Roth* Farkas was only entitled to due process which would provide him with "an opportunity to clear his name." *Roth*, 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12. The Court notes that at the time of Farkas' transfer and subsequent resignation, the Interim Faculty Grievance Procedure (IFGP) was in effect. Under the IFGP Farkas could have initiated a grievance to "clear his name" by challenging the terms and conditions of his employment that violated existing policies and restricted his liberty interest under *Roth*.

### 3. The Process that is Due

When a government employer seeks to discharge an employee who has a property interest in continued employment, procedural due process requires the employer to provide notice and an opportunity to be heard. *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). Although the constitutional requirements of procedural due process generally require "notice" and "hearing," the specific forms may vary in differing contexts.

Courts distinguish between the due process required by the Constitution and the various forms of administrative "due process" required by different institutions for their various organizational purposes. In *Levitt v. University of Texas at El Paso*, 759 F.2d 1224 (5th Cir.1985), a tenured professor alleged denial of his procedural due process rights in part because the public academic employer failed to observe its own rules in dismissing him. The *Levitt* court stated:

> There is not a violation of due process every time a university or other govern-

ment agency violates its own rules. Such action may constitute a breach of contract or violation of state law, but unless the conduct trespasses on federal constitutional safeguards, there is no constitutional deprivation.

*Levitt,* at 1230. *See Garrett v. Mathews,* 625 F.2d 658, 660 (5th Cir.1980). The issue in a § 1983 claim alleging violation of procedural due process rights is whether the minimal constitutional requirements have been satisfied, not whether some institutional rules have been met.

The necessity and rigor of any procedure depends on its purpose. In *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Court required both pretermination and post termination hearings. The Court stated that a government employee with discharge for just cause protection should receive "notice" of the charges and the opportunity to "respond" before termination. However, the *Loudermill* Court indicated that constitutionally the pretermination hearing could be merely a "right-of-reply" hearing as a check against mistaken decisions. *Id.* at 545, 105 S.Ct. at 1495. The essential elements of a *Loudermill* hearing are an "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546, 105 S.Ct. at 1495. Further, constitutionally the hearing did not require an impartial decision maker, but could be conducted before the supervisory official initiating the disciplinary termination.

The Court's rationale for a minimal pretermination hearing recognizes the interest of the government employer in conducting its affairs. The Court stated: "To require more than this *prior to termination* would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.* On the other hand, the purpose of the *posttermination* hearing is to adjudicate facts and apply the appropriate legal principles to "definitively resolve the propriety of the discharge." *Id.* at 546, 105 S.Ct. at 1495. *See Duchesne v. Williams,* 849 F.2d 1004 (6th Cir.1988).

These legal standards apply to terminations of employees with discharge for just cause protection. Interdepartmental transfers of probationary employees, of course, constitute qualitatively less drastic personnel actions.

Alleging and establishing the denial or inadequacy of a meaningful postdeprivation remedy is essential in order to prevail on a procedural due process claim. In *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court held:

> [W]e hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the states action is not complete until and unless it provides or refuses to provide suitable postdeprivation remedy.

*Hudson,* at 533, 104 S.Ct. at 3203. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Courts have prudently required that claims for denial of procedural due process under § 1983 plead and prove the inadequacy of state remedies. In *Vicory v. Walton,* 721 F.2d 1062 (6th Cir.1983), the court said:

> [T]o invoke section 1983 in the absence of a showing that state remedies are deficient would "make of the fourteenth amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Parratt,* 451 U.S. at 544, 101 S.Ct. at 1917 (quoting *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)).

. . . .

The reasoning of *Parratt* appears to extend at least to all section 1983 cases claiming a procedural due process injury to a property interest without regard to whether at common law a plaintiff would have sued in tort or contract and would have based his action intent, negligence or strict liability.

Policy considerations do not require a federal hearing in procedural due process cases that can be corrected in state court.

Section 1983 was not meant to supply an exclusive federal remedy for every alleged wrong committed by state officials. Rather, the statute is a remedy for only those wrongs which offend the Constitution's prohibition against property deprivations without procedural due process. Thus we hold that in section 1983 damage suits claiming the deprivation of a property interest without procedural due process of law, the plaintiff must plead and prove that state remedies for redressing the wrong are inadequate. In a procedural due process case under section 1983, the plaintiff must attack the state's corrective procedure as well as the substantive wrong.

*Vicory*, at 1064.

Furthermore, the constitutional adequacy of the relief is assessed simply by whether it compensates a plaintiff for the loss suffered. As the Court in *Parratt* stated:

It is argued that the State does not adequately protect the respondent's interest because it provides only for an action against the State as opposed to its individual employees, it contains no provisions for punitive damages, and there is no right to a trial by jury. Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process. The remedies provided could have fully compensated the respondent for the property loss he suffered, and we hold that they are sufficient to satisfy the requirements of due process.

*Parratt*, 451 U.S. at 544–545, 101 S.Ct. at 1917–1918.

■ In the present case, if Farkas' property interest was constitutionally impaired, then this Court determines that Farkas received all the procedural process that was required under the circumstances. On April 22, 1987, Ross–Lee transferred Farkas from the DFM to the DCHS. The pleadings and supporting documentation indicate that Ross–Lee on her own initiative ordered Farkas' transfer in her capacity as chair of the DFM. Insofar as she transferred Farkas without the prior consent of Farkas, her superiors, or the transferee department, Ross–Lee may have violated Farkas' "due process" for purposes of the COM's by-laws. This is amply attested and admitted by Provost Scott, Magen, and Ross–Lee.

However, insofar as Ross–Lee' transfer of Farkas was an act unauthorized by COM by-laws and unilaterally initiated and effected by Ross–Lee, a formal pretermination hearing was impractical under the *Hudson* and *Parratt* analysis. Although the COM by-laws may have provided formal procedures for a collegial discussion exploring the possibilities for an interdepartmental transfer, Ross–Lee's decisive and unauthorized action precluded any such formal deliberative consultation. The factual character of Ross–Lee's unauthorized "misconduct" rendered any pretransfer impracticable. Moreover, as soon as Farkas informed Provost Scott, Farkas was retransferred to correct the unauthorized misconduct and comport with MSU/COM procedures.

Nevertheless, if some pretransfer hearing was required even under the exigent circumstances of Ross–Lee's "misconduct," Farkas' constitutional due process rights were adequately protected by the functional equivalent of "notice" and "hearing." On April 20, 1987, Farkas met with Potchen, Williams, and Ross–Lee. During the discussion of the situation, Potchen, Williams, and Ross–Lee all suggested that Farkas resign. In termination cases, the purpose of the *Loudermill* pretermination hearing is to serve as a check against mistaken decisions, not to resolve the legal propriety of a termination. Considering the suggestion of Potchen, Williams, and Ross–Lee at the April 20, 1987, meeting that Farkas resign, this Court determines that no other pretransfer hearing was constitutionally required to "check against

mistaken decisions." Moreover, the subsequent transfer was minimal compared to the suggested resignation.

Additionally, this Court notes that under *Vicory* Farkas has failed to plead or appropriately demonstrate that an issue of material fact exists as to whether the available state remedies were constitutionally inadequate. Although a formal procedure apparently was not invoked, Provost Scott informally intervened and effected Farkas' transfer back into the DFM after informing Ross–Lee that MSU/COM by-laws were not observed in Farkas' transfer. Even though Farkas' transfer back into the DFM does not provide him with all the relief that he possibly could receive if he prevailed on a § 1983 claim, it does restore to him his lost property interest in his appointment to the DFM. Further, Farkas currently has a five count action before the Michigan Court of Claims, which could even further compensate him for his lost property interest. Although the state court action does not provide for either a jury or punitive damages, it does provide compensation for the loss of his property interest and, therefore, satisfies the constitutional requirements of procedural due process. *See Parratt, supra,* at 543, 101 S.Ct. at 1916.

## B. QUALIFIED IMMUNITY

The doctrine of qualified immunity recognizes the need of government officials to be free from harassing lawsuits and apprehension of personal liability when they exercise authority and discretion while performing their jobs in the public interest. *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). In *Harlow v. Fitzgerald,* 457 U.S. 800, at 818, 102 S.Ct. 2727, at 2738, 73 L.Ed.2d 396 (1982), the Court stated that where government officials perform discretionary functions they "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The availability of qualified immunity is evaluated on the objective legal reasonableness of the challenged conduct in view of clearly established contemporaneous law. *Harlow, su-*

*pra.* Further, an allegation of subjective malice alone will not preclude an official's claim to qualified immunity. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Moreover, the availability of qualified immunity is to be determined by the judge. *Donta v. Hooper,* 774 F.2d 716, 719 (6th Cir.1985).

The Sixth Circuit has often restated this standard, most recently in *Garvie v. Jackson,* 845 F.2d 647, at 649 (6th Cir.1988):

We should focus on whether, at the time defendants acted, the rights asserted were clearly established by the Supreme Court or the courts of this federal circuit.... "[D]efendants have qualified immunity unless plaintiffs' 'rights were so clearly established when the acts were committed that any officer in the defendant's position, measure objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'" ... These principles would indicate that despite plaintiff's general assertions of constitutional violation, he must set out a particular and clearly established violation in order to prevail against a claim of qualified immunity.

In *Garvie* the former head of a university department claimed that he was wrongfully removed as department head after he complained to the provost that the dean had mismanaged personnel evaluations and department funds. The former department head sued the dean and provost under 42 U.S.C. § 1983 alleging violation of his First and Fourteenth Amendment rights. The district court granted summary judgment on the basis of qualified immunity finding that "competent university administrators could reasonably have concluded" that their actions did not violate any First or Fourteenth Amendment rights.

In the present case, Ross–Lee could not have reasonably concluded that her unauthorized transfer of Farkas out of the DFM into the DCHS comported with MSU/COM by-laws. But that is not the issue. The issue is whether defendants could have reasonably concluded that their conduct would violate any clearly estab-

lished statutory or constitutional law. In response to the defense of qualified immunity, Plaintiff asserts "that both property and liberty interests were deprived by the manner in which he was transferred without due process from the Department of Family Medicine and the malicious false accusations and acts committed by Dr. Ross–Lee once he was reinstated." Plaintiff's Reply in Opposition to Defendants' Motion to Dismiss, at 31. This Court has determined that the transfer violated no Federally protected cognizable property or liberty interest. Moreover, malicious and false accusations impugning reputation do not clearly constitute any constitutional violation. *See Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Accordingly this Court determines that defendants could have reasonably concluded that the transfer of Farkas from the DFM to the DCHS and their subsequent false and malicious accusations did not violate any constitutional property or liberty interests.

### III. CONCLUSION

In accordance with the foregoing analysis this Court grants defendants' motion for summary judgment and dismisses plaintiff's amended complaint alleging deprivation of his property and liberty interests without due process of law brought under 42 U.S.C. § 1983.

C. Parish, Sault Ste. Marie, Mich., of counsel), for Hannahville Indian Community.

Jeanette Wolfley, Native American Rights Fund, Boulder, Colo., for Bay Mills Indian Community.

Daniel T. Green, Sault Ste. Marie, Mich., Bruce R. Greene, Boulder, Colo., Sault Ste. Marie Tribe of Chippewa Indians.

Garfield W. Hood, L'Anse, Mich., for Keweenaw Bay Indian Community.

William Rastetter, Cedar, Mich., for Grand Traverse Band of Ottawa & Chippewa Indians.