SOUTHSIDE PUBLIC SCHOOLS, et al., Appellants,

v.

Sue HILL, Brenda Robinette, Kathy Kelly, Diane Baker, and Jeanette Cordell, Appellees.

Nos. 86–2125–EA, 86–2126–EA and 86–2221–EA.

United States Court of Appeals, Eighth Circuit.

Submitted June 10, 1987.

Decided Aug. 11, 1987.

Rehearing and Rehearing En Banc Denied Sept. 25, 1987.

Marcia Barnes, Little Rock, Ark., Joy L. Koletsky, Washington, D.C., for appellants in No. 86–2221–EA and appellee in No. 86–2125–EA.

W. Paul Blume and G. Ross Smith, Dan F. Bufford, Little Rock, Ark., for appellees in No. 86–2221–EA.

W. Paul Blume, G. Ross Smith, Little Rock, Ark., for appellants in No. 86–2126–EA.

Joy L. Koletsky, Washington, D.C., for appellees in No. 86–2126–EA.

Dan F. Bufford, Little Rock, Ark., for appellants in No. 86–2125–EA.

Before ARNOLD and WOLLMAN, Circuit Judges, and DUMBAULD,* Senior District Judge.

* The Honorable Edward Dumbauld, U.S. Senior District Judge of the Western District of Pennsylvania, sitting by designation.

DUMBAULD, Senior District Judge.

All questions regarding damages having been settled by agreement of the parties, it remains for this Court only to pass upon the question whether the jury's verdict in favor of plaintiffs-appellees was supported by sufficient evidence and pursuant to proper instructions.

The principal issue is whether appellees (Arkansas school teachers) were exercising constitutionally protected rights of free speech under the First Amendment when they complained about a colleague's deficiencies in implementing the programs provided by federal law for handicapped pupils, or were merely asserting a personal grudge or internal grievance over employment and working conditions [1] which should have been processed through channels rather than by "going public" [2] and sending a letter to the State Department of Education [3] which resulted in an investigation disclosing certain defects in the school's procedures.

Our examination convinces us that the teachers' complaint was indeed a matter of public concern, protected by the First Amendment; that the rulings of the District Court [4] were in conformity to current case law; and that the jury's verdict was supported by sufficient evidence. Accordingly, we affirm.

Elaboration of the facts will elucidate the questions at issue. Congress provided, by the Act of April 13, 1970, 84 Stat. 175, as amended, 20 U.S.C. 1401 et seq. federal subsidy for states declaring acceptance of the goal of providing "a free appropriate public education for all handicapped children." [5] The Arkansas program in the Southside Public School District of Independence County was administered by one Nancy Rutledge. Appellees are former teachers in the rural elementary school near Batesville, Arkansas. They were concerned about delays and hindrances impairing the special education program. Brenda Robinette was principal of the school. She and Kathy Kelly ultimately resigned. Sue Hill, Diane Baker, and Jeanette Cordell were terminated by non-renewal of their contracts. After vainly discussing the problems regarding placement of their handicapped students in special education with Nancy Rutledge and then with the appellant administrators and school board, appellees and eight other teachers on June 26, 1984, addressed a letter to the State Department of Education [6] with a specific enumeration of instances of failure to follow established procedures. The ensuing investigation and report of August 22, 1984, embarrassed the school administrators who thought it was "intended to make our school look bad." [7]

1. The controlling criterion is expounded in *Connick v. Myers*, 461 U.S. 138, 146–48, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983); *Cox v. Dardanelle Public School Dist.*, 790 F.2d 668, 672–74 (8th Cir.1986).

2. Appellants repeatedly stressed that appellees were properly disciplined for going outside the "chain of command" with their grievances. Yet under skillful cross-examination even defendant Smith conceded that after exhaustion of remedies at the local level without result resort to the State level, as the apex of the chain, would be justified. Tr. 891–93 (Smith). The teacher's letter was written to a higher authority within the Arkansas system of public education, not to the general public through a newspaper as in *Pickering*.

3. The three page letter of June 26, 1984, to the Arkansas Department of Education seems to be the central feature in appellants' grievance against the teachers which resulted in disciplinary action and harassment against appellees.

The letter is found at pp. 8–10 of the Designated Record on appeal, hereinafter referred to as "DR". Strangely, it is not set forth in the brief of either party. The special Education Section's Report of its investigation appears at pp. 11–13.

4. The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas, Northern Division.

5. For the development of this statutory program see *Hendrick Hudson Distr. Bd. of Education v. Rowley*, 458 U.S. 176, 179–84, 102 S.Ct. 3034, 3037–39, 73 L.Ed.2d 690 (1982).

6. See note 3, *supra*. Nancy Rutledge was not referred to by name in the letter, or in the report of August 22, 1984.

7. Trial transcript (hereinafter referred to as "Tr.", followed by the name of the witness in parentheses) 18 (Harding); 43 (Duke); 542, 608 (Blount).

The report found that the complaint letter was substantiated by the school's files and records, and "that a significant breakdown in compliance with due process procedures [8] occurred during the 1983–84 school year."

The report went on to say

Review of folders verified that the school district was inconsistent in following timelines [9] for conducting referral and evaluation conferences, did not provide sufficient notification to participants of conferences and did not conduct annual reviews for all special education students.

The report then set forth the following conclusions:

CONCLUSIONS

The school will be required to follow referral/evaluation/placement due process procedures to assure appropriate program development for all eligible handicapped students. The district is directed to move forward in developing standard procedures to be followed by all staff in conducting due process activities. The district will submit a plan detailing the manner in which they will remove the noted deficiencies. This plan should be submitted to Mr. John Duke by September 7, 1984. All parties are directed to move forward and cooperate in planning and implementing the program to best meet the needs of handicapped students in the Southside School District.

Our scrutiny of the teachers' letter and the report of the ensuing investigation by the Arkansas Department of Education [10] convinces us that the signatories to the letter of complaint were indeed exercising their rights as citizens regarding a matter of public concern [11] with respect to the quality of education in the community and to observance of federal policy as prescribed by Congress for the welfare of handicapped children.

They were not asserting a private grievance respecting employment or working conditions. The result reached in *Connick* (461 U.S. at 147, 103 S.Ct. at 1690) that "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior" is not applicable to the circumstances established by the evidence in the case at bar.

The case at bar is quite like that presented by the facts in *Pickering v. Board of Education*, 391 U.S. 563, 568–73, 88 S.Ct. 1731, 1734–37, 20 L.Ed.2d 811 (1968). There the teacher wrote to a newspaper criticizing the board for spending too much for athletics and not enough for teachers' salaries. The educational impact of the conduct criticized was recognized by the Supreme Court as an appropriate matter for public concern and uninhibited discussion and debate. The same is true of the criticized conduct in the case at bar, though here the shortcoming was failure to execute effectively the special educational program. Lack of financial support because of diversion of funds is not the only way to impair an educational program. Sloth or indifference on the part of the teacher in charge of the program, with the acquiescence of her supervisors and the board, can be equally detrimental.

Nor were the complaining teachers prosecuting a personal vendetta or feud against Nancy Rutledge, as appellants also contend.[12] They held nothing against her except her failure to give effect to the statu-

8. "Due process procedures" are steps designed to identify "handicapped" students and formulate an appropriate educational plan for them, including input by parents and school staff, in developing an IEP (individual educational program) for each child. Tr. 13–16 (Harding)

9. This phrase would seem to be "pedaguese" for "was often late."

10. Although under the Fourth Amendment probable cause for a search is not shown by what the search brings to light, it is proper to consider the result of the Department's investigation here as tending to show the *bona fides* and public spiritedness of the authors of the letter instigating the inquiry.

11. See note 1, *supra*.

12. Tr. 25 (Harding); 479 (Blevin); 700 (Grabill).

tory policy and established educational procedures for the welfare of handicapped children. Surely such a shortcoming is to be regarded as a legitimate area of public concern. See *Cox, supra* note 1, 790 F.2d at 673; *Bowman v. Pulaski Co. Special School District*, 723 F.2d 640, 644 (8th Cir.1983); *Pickering, supra*, 391 U.S. at 571, 88 S.Ct. at 1736 ["a difference of opinion ... as to the preferable manner of operating the school system ... clearly concerns an issue of general public interest."]

The trial judge thus properly weighed the interests involved, and determined *in limine* that the matters concerning which the teachers complained were matters of public concern with respect to which they were exercising protected constitutional rights, if the allegations of their pleadings were established to the satisfaction of the jury; and there was sufficient evidence to support the jury's verdict.[13]

The jury's verdict, under proper instructions, likewise disposed of appellant's claim to the *Mt. Healthy* defense[14], *i.e.* their contention that sufficient causal connection was lacking between the exercise of protected rights and the adverse consequence (dismissal or non-renewal of contract, and the like).

In the case at bar the jury determined, with respect to each plaintiff, that it was not true that the adverse consequences suffered would have occurred "even if she had not exercised her first amendment rights." So the *Mt. Healthy* defense was of no avail to appellants.

The retaliatory action in response to appellees' exercise of protected rights was clearly established. It consisted in nonrenewal of their contracts in the case of Diane Baker, Jeanette Cordell, and Sue Hill; and constructive discharge in the case of Kathy Kelly and Brenda Robinette, who had resigned under pressure.[15] Such retaliation was mainly in reaction to the letter of June 26, 1984.[16] Other clearly unwarranted restrictions were imposed on consultation by teachers with their advisers. The District Court properly found that attendance at school board meetings by the teachers was constitutionally protected speech, and also "that plaintiffs had a constitutionally protected right to consult with their attorney, sue for alleged grievances, and consult with representatives of their professional organizations" (DR 52).[17]

Appellants' reliance on a defense of official immunity also misses the mark. Such a defense in any event would protect only the individual defendants, and not the school district. Except in the cases of Kathy Kelly and Brenda Robinette the verdicts against individual defendants also held the school district liable jointly and severally.

In *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214

---

13. Whether the facts pleaded or proved by evidence sufficient to go to the jury constitute protected speech is a question of law. *Connick*, 461 U.S. at 148, 103 S.Ct. at 1690; *Cox*, 790 F.2d at 672. But the jury must determine as questions of fact whether protected activity in fact occurred and whether it was a substantial factor in causing injury to the actor. In the case at bar the jury made both such findings with respect to each plaintiff and defendant. Accordingly our decision does not conflict with the recent Third Circuit case of *Bennis et al. v. Gable, et al.*, 823 F.2d 723 (3rd Cir.1987).

14. *Mt. Healthy City Bd. of Education v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977).

15. A constructive discharge occurs when an employer deliberately renders an employee's work-ing conditions intolerable in order to force the employee to quit the job. *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981).

16. Tr. 122 (Robinette); 255 (Cordell); 410 (Baker); 601–603 (Blount); 642 (Milliken, a board member); 892–93 (Smith).

17. There were also instances of minor harassment, such as removal of chairs from the teachers' lounges, prohibition of sitting together at lunch, angry interviews, retroactive unsatisfactory ratings placed in personnel files, and the like. Because of the preceding clear violations of First Amendment rights, we need not consider whether these minor harassments would, standing alone, rise above the level of *de minimis*. Compare *Bennis v. Gable*, note 13 *supra*, with *Delong v. U.S.*, 621 F.2d 618, 624, 626 (4th Cir.1980).

(1975), cited by appellants, the Court held that

> a school board member, who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges. Such a standard imposes neither an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system.... Therefore, in the specific context of school discipline, we hold that a school board member is not immune ... *if he knew or reasonably should have known that the action he took* within his sphere of official responsibility *would violate the constitutional rights* of the student affected, *or if he took the action with the malicious intention to cause a deprivation of constitutional rights* or other injury to the student. That is not to say that school board members are "charged with predicting the future course of constitutional law." *Pierson v. Ray*, 386 U.S. [547] at 557 [87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967)]. A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith. (Italics supplied).

It will be noted that this holding established alternative bases for liability: malicious intention *or* where the official "knew or reasonably should have known" that his action would violate constitutional rights.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 815–19, 102 S.Ct. 2727, 2736–38, 73 L.Ed.2d 396 (1982), the Court undertook to refine the standard with a view to eliminating extensive controversy regarding subjective state of mind. Accordingly it held that mere allegations of malice did not suffice to negate immunity, but that the objective reasonableness of an official's conduct should be "measured by reference to clearly established law" (457 U.S. at 818, 102 S.Ct. at 2738). The trial judge must ascertain "not only the currently applicable law, but whether that law was clearly established at the time" of the official's action.

Applying then the "known or reasonably should have known" prong of *Wood*, and the "clearly established" gloss of *Harlow*, to the case at bar, we must conclude that a school teacher's constitutional right to free speech on matters of public concern was "clearly established" long before 1984. *Connick* was decided on April 20, 1983, but *Pickering*, more similar factually to the case at bar and involving the school setting, dates from 1968, and the Court in that case pointed out that the principle protecting the teacher's rights to speak rested upon "numerous prior decisions of this Court" (citing cases dating back to 1952) (391 U.S. at 568, 88 S.Ct. at 1734).

■■■ At the time of appellants' adverse action which injured appellees, therefore, a teacher's right to comment on matters of public concern had long been settled and was clearly established. To overcome this well-settled rule, of which appellants were reasonably bound to have been aware, they needed, in order to escape liability, an equally clear and salient state of facts bringing them within the *Connick* exception. But it was obvious, to a qualified educator or school board member, that the facts in the case at bar did not justify deviation from the "public concern" category. They therefore knew or reasonably should have known that their actions violated appellees' clearly established constitutional rights and furnished no basis for claiming official immunity.

Dramatic confirmation *a fortiori* of our conclusion that appellees' interest in proper compliance with the policy of Congress relating to appropriate education of handicapped children is a matter of public concern was furnished by the Supreme Court's decision of June 24, 1987, in *Rankin v.*

*McPherson,* —— U.S. ——, 107 S.Ct. 2891, 97 L.Ed.2d 315.

There, in a 5–4 decision, the majority held that a Texas deputy constable, a black woman nineteen years old, whose job was typing data from court papers into a computer, could not be discharged for remarking to her boyfriend, when on March 30, 1981, the radio announced that an attempt had been made to assassinate President Reagan, "if they go for him again, I hope they get him." Unfortunately, her comment was overheard and reported to the Constable who summarily discharged her when she admitted making the statement. This led to "a dispute that now has been considered five separate times by three different federal courts," as Justice Powell noted in his concurring opinion.

That the case at bar is a much clearer case of public concern than *McPherson* is shown by the fact that, as pointed out by Justice Scalia's dissent, McPherson's statement was "only one step removed from statements that we have previously held entitled to no First Amendment protection": assassination threats against the President and "fighting words." Moreover, the Constable, a law enforcement officer, obviously had "a strong interest in preventing statements by any of his employees approving, or expressing a desire for, serious, violent crimes—regardless of whether the statements actually interfere with office operations at the time they are made or demonstrate character traits that make the speaker unsuitable for law enforcement work."

Nevertheless, the majority of the Court applied the *Pickering-Connick-Mt. Healthy* criteria in favor of protecting the employee's speech. Surely, *a fortiori,* the same result must be reached by us in the case at bar.

Accordingly, the judgment of the District Court is AFFIRMED.