Estera MILMAN, Plaintiff,

v.

Stephen PROKOPOFF, Jon Whitmore, and W.H. Knight, Jr., Defendants.

No. 3–99–CV–90034.

United States District Court, S.D. Iowa, Davenport Division.

May 17, 2000.

Patrick E. Ingram, Iowa City, IA, for plaintiff.

George A. Carroll, Darci L. Frahm, Assistant Attorneys General, Des Moines, IA, for defendants.

## ORDER

PRATT, District Judge.

Before the Court is Defendants' Motion for Summary Judgment filed January 24, 2000. Plaintiff also filed a cross Motion for Summary Judgment on February 9, 2000, but given its untimely filing,[1] the Court will not consider Plaintiff's cross Motion. The Plaintiff filed her resistance on February 9, 2000. The Defendants filed their reply on February 25, 2000. Defendants' Motion seeks a declaration as a matter of law that a grievance filed by the Plaintiff is not protected by the free speech clause of the First Amendment. Plaintiff asserts that her grievance is protected speech. The Court held oral argument on the Motion on May 5, 2000 at the United States Courthouse in Des Moines, Iowa. The matter is submitted.

### I. Facts

The present Motion for Summary Judgment grows out of an action filed on March 4, 1999, and later amended, by Plaintiff Estera Milman ("Milman"), a curator at the University of Iowa Museum of Art ("the Museum"). The amended Complaint names three Defendants: Stephen Prokopoff ("Prokopoff"), then-Director of the Museum; Jon Whitmore ("Whitmore"), Provost of the University of Iowa ("the University"); and W.H. Knight, Jr. ("Knight"), Vice Provost of the University. Milman alleges Defendants violated her First and Fourteenth Amendment right to free speech when Defendants retaliated against her for filing a work-related grievance against Prokopoff.

As the matter comes on Defendants' Motion for Summary Judgment, the Court will set out the facts in a light most favorable to Milman as the non-moving party. See Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir.1994).

Plaintiff is an adjunct curator at the Museum and adjunct associate professor at the University of Iowa School of Art. For purposes of the University's employee classification system, Plaintiff is considered a "Professional and Scientific" employee. She has been employed at the Museum since 1994 and continues in that capacity to the present day. Milman also worked in the School of Art for an unspecified amount of time prior to joining the Museum. She is a specialist in twentieth century art. She has curated art exhibits in Taipei, Taiwan, New York City, and at the University. Milman has taught classes and continues to advise graduate students, presumably in her specialty area.

Milman has one of the best track records at the University in terms of obtaining grants from the National Endowment for the Arts ("NEA"). Two NEA-sponsored grants which she helped to write are

---

1. By Order of October 21, 1999, United States Magistrate Judge Thomas J. Shields rather emphatically set the dispositive motion deadline for February 1, 2000. Because Plaintiff has not offered any compelling reason for the late filing, the Court denies this motion.

Plaintiff also filed on May 2, 2000 a Motion to Overrule the Magistrate's Ruling Striking the Affidavits of the Plaintiff's Witnesses or in the Alternative to Strike the Defendants['] Affidavits as Well (Clerk's # 52). Likewise, no compelling reason has been offered to reverse Judge Shields on this matter. Plaintiff's May 2d motion is denied.

at the center of her First Amendment claim against the Defendants.

One NEA-funded project involved an exhibit and catalogue of the works of artist Alice Hutchins.[2] During preparations for the Alice Hutchins Exhibit which was to be held March 14, 1998 through May 10, 1998, Milman and then-Museum director Stephen Prokopoff had a dispute over the editing of a five-page brochure that accompanied the Hutchins Exhibit. Prokopoff deleted a three-page interview between Plaintiff and Hutchins in part because the interview had been published elsewhere and because he thought many readers would not understand the artist's "obscure references." Prokopoff also made grammatical and stylistic corrections to a one page introductory essay on Alice Hutchins and a one page catalogue listing of all the works from the ATCA collection. Milman appears only to dispute the deletion of the three-page interview and not the grammatical and stylistic changes.

Prior to the opening of the Hutchins Exhibit, Milman grieved Prokopoff's deci-

sion to remove the Hutchins interview from the brochure. She set forth her objections in a March 9, 1998 letter[3] addressed to Prokopoff. In that letter, Milman wrote in part:

> The substance of my grievance is my understanding that you are misapplying the University's established policy on a Department Executive Officer's "Project Management Responsibilities" as outlined in Chapter 5: Policy and Procedures on Gifts, Grants, and Contracts [Section 5.3 of the University's Operations Manual][4].... It is my understanding that a Departmental Executive Officer's roles and responsibilities are specific to guaranteeing that costs incurred under sponsored projects fall within allocated funds and that a DEO does not have any authority over the intellectual content of grant related research and publishing. As I am of the confirmed opinion that University policy protects the intellectual integrity of any grant funded Principle investigator's scholarly production, and in keeping

**2.** The Alice Hutchins exhibit was part of a larger NEA-funded effort to consolidate the Alternative Traditions in the Contemporary Arts ("ATCA") collection at the University. The ATCA collection, as explained in the ATCA grant application, demonstrates "alternative art produced in Europe and America after World War II through the 1980s." Alice Hutchins belongs to this group of artists. According to the ATCA grant application filed by the University in 1993, the NEA grant would be used to better present the collection to the public and students, by physically moving it to the Museum (from the School of Art and Art History) "where it will be housed in a climate controlled environment allowing for the presentation of the collection and concurrently making it accessible for study." Defs.' Ex. C.

**3.** This letter actually bore the date "March 9, 1997," but the parties all agree that the date should have been "March 9, 1998."

**4.** Section 5.3(a) states that the "University, in accepting externally sponsored awards, assures its many sponsors that project activities are conducted in accordance with the scope of work and that expenditures incurred under these awards comply with applicable sponsor

and University policies. This assurance is not possible unless there is a coordinated effort between the project directors, their departments and colleges, and the University's central administrative offices to properly administer the sponsored awards."

Section 5.3(b) sets forth the roles and responsibilities of the Project Director, the title claimed by Milman for the NEA-funded exhibitions at issue in this lawsuit. That subsection provides, in relevant part: "The project director is responsible for the overall programmatic and fiscal direction of the sponsored project.... The project director is ultimately responsible to his or her departmental executive officer for resolving in a timely manner any overexpenditures or unallowable costs that occur on a sponsored project."

Section 5.3(c) sets forth the roles and responsibilities of the Departmental Executive Officer, the title Milman asserts Prokopoff had for the NEA-funded exhibitions. That subsection, in relevant part, provides: "The [DEO] is responsible for assuring that costs incurred under sponsored projects conducted within the department comply with sponsor and University policies and are within the resources available to the project directors."

with established grievance procedure, I would like to request a conference so that we can collectively and amicably seek a remedy to what I perceive to be your misinterpretation of established University policy.

Defs.' Ex. D (hereinafter "Hutchins grievance").

On March 10, 1998, Prokopoff retaliated.[5] against Milman for filing her grievance by postponing indefinitely an upcoming Museum exhibit entitled "No!Art and the Aesthetics of Doom" ("Doom" or "the Doom Exhibit").[6] The Doom Exhibit was supported by another NEA grant which Milman helped to write.

Doom was scheduled to open to the public September 6, 1998 and run until October 25, 1998. Its opening was scheduled to coincide with the University's celebration of the 50–year anniversary of the Universal Declaration of Human Rights. The application filed by the Museum and the University in support of the Doom Exhibit ("the Doom application") projected that 100,000 people were "expected to benefit" from the project. The Doom grant is set to expire in June of 2000 meaning any unused grant funds earmarked for the Exhibit revert back to the NEA. The Doom Exhibit has yet to be staged.

On or about May 5, 1998, Milman amended her Hutchins grievance to include Prokopoff's cancellation of the Doom Exhibit. In her amended grievance (which was memorialized in a letter addressed to Knight), Milman protested Prokopoff's effective cancellation of the upcoming Doom Exhibit. "Because conflicts continue to arise as to such matters as catalogue text," she wrote, "I request the assistance of the Provost's Office in identifying a mechanism by which such conflicts might be addressed and resolved." Defs.' Ex. E ("the Doom grievance"). Unresolved issues including control over content has prevented the Doom Exhibit from being staged.

In addition to the suspension of the Doom Exhibit, the Plaintiff asserts that her Hutchins grievance against Prokopoff spawned a series of retaliations committed by Defendants.[7] For the most part, De-

**5.** At a July 15, 1998 grievance hearing attended by Plaintiff, her counsel, and various University administrators, Prokopoff admitted (and University officials later conceded) that cancellation of Doom was in retaliation for Milman grieving the Alice Hutchins brochure incident. In a letter to Plaintiff's counsel dated September 22, 1998, Vice Provost Knight and Kevin Ward, the Assistant Director of Human Resources for Employee and Labor Relations at the University, stated: "We have no dispute on Ms. Milman's retaliation claim. The fact that Mr. Prokopoff stated that his postponement of the No!Art Exhibition was an act of retaliation against Ms. Milman because of her initiating the original grievance speaks for itself. Because such acts are explicitly prohibited in University Policy, neither of us sees a need to conduct a hearing on this issue." Pl.'s Ex. 7.

**6.** According to the Doom grant application for this exhibit, the Doom Exhibit was to be "devoted to the investigation of a pivotal mid-century collective of artists and poets who eloquently responded to the aftermath of the Holocaust and Hiroshima, the atomic crisis, and the mass-media's commodification of women." Pl.'s Ex. 3. In early 1995, the NEA awarded the University of Iowa and the Museum a $20,000 grant to stage the Doom Exhibit.

**7.** These retaliations include: (1) at the July 15, 1998 grievance hearing (referenced in footnote five), Prokopoff stated he called the NEA asking how Milman could be dismissed from her position as the principal investigator for NEA grants; (2) the Doom Exhibit was moved to a space one-quarter the size of the original allotted space inside the Museum, space which Plaintiff contends is inadequate for a proper showing of the exhibit; (3) for the 1998–1999 fiscal year, Milman received a 0.501% increase while all other Museum officials received at least a 3.625% salary increase; after Milman raised this salary issue with University officials, the University in December of 1998 increased her salary 3.625% for the 1998–1999 fiscal year; (4) the University, through the actions of Knight, allegedly reneged on its promise to provide financial support required by the Doom grant; (5) finally, Milman asserts that after filing this lawsuit, the Defendants removed the Doom Exhibit from the Museum calendar entirely and ordered University staff and officials not

fendants do not deny that the events summarized in footnote seven took place, or that they were largely the result of Plaintiff's grievance. As the Court stated above, the focus of Defendants' Motion for Summary Judgment is whether Plaintiff's grievance can properly be characterized as protected speech in the first instance.

## II. Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.*

To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Continental Grain Co. v. Frank Seitzinger Storage, Inc.*, 837 F.2d 836, 838 (8th Cir.1988). Importantly, in order to defeat a motion for summary judgment, the nonmoving party must go beyond the pleading and by affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The quantum of proof that the nonmoving party must produce is not precisely measurable, but it must be "enough evidence so that a reasonable jury could return a verdict for the nonmovant." *Anderson*, 477

U.S. at 257, 106 S.Ct. 2505. On a motion for summary judgment, the court views all the facts in the light most favorable to the nonmoving party, and gives that party the benefit of all reasonable inferences that can be drawn from the facts. *See United States v. City of Columbia*, 914 F.2d 151, 153 (8th Cir.1990).

## III. Plaintiff's First Amendment Claim

■■■ A public employer may not discharge or otherwise retaliate against a public employee "on a basis that infringes [upon] that employee's constitutionally protected interest in freedom of speech." *Kincade v. City of Blue Springs*, 64 F.3d 389, 395 (8th Cir.1995), *cert. denied*, 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996), (quoting *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). The parties correctly point out that determining whether speech is protected involves a two-step analysis. The first question is whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Bausworth v. Hazelwood Sch. Dist.*, 986 F.2d 1197, 1198 (8th Cir.1993). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. Second, if the speech addresses a matter of public concern, the court must balance the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Both of these questions are issues of law for the court. *See Connick*, 461 U.S. at 148 n. 7,

to discuss any aspect of the Doom Exhibit with her.

103 S.Ct. 1684.[8]

### A. Matter of public concern

 An employee's speech touches upon a matter of public concern when it "relat[es] to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684. In determining whether employee speech touches on a matter of public concern, the Court must look to the "content, form, and context" of the statements that comprise the speech "as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. The speech need not be addressed to the public or media to be considered a matter of public interest; speech of a public concern can happen privately between an employee and his superior. *See Campbell v. Arkansas Dep't of Correction*, 155 F.3d 950, 959 (8th Cir.1998). The focus of the inquiry "is on the role the employee has assumed in advancing the particular expressions." *Cox v. Dardanelle Public Sch. Dist.*, 790 F.2d 668, 672 (8th Cir.1986) (citing *Connick*, 461 U.S. at 143, 147–48, 103 S.Ct. 1684). Speech will touch on a matter of public concern if the employee has assumed the role of "a concerned public citizen, informing the public that the state institution is not properly discharging its duties, or engaged in some way in misfeasance, malfeasance nor nonfeasance[.]" *Id.* at 672. If the public employee is speaking out *"merely* as an employee, concerned *only* with internal policies or practices which are of relevance *only* to the employees of *that institution*," then the speech is not protected. *Id.* (emphasis added).

 The Court turns first to the Hutchins grievance. On the Court's review of the record, it appears that many aspects of

Milman's March 9, 1998 letter to Stephen Prokopoff evidence simply an employee grievance related to a workplace issue—namely who had authority at the Museum to decide if a three page interview would appear in an exhibit brochure. Her letter clearly states that it was brought pursuant to the provisions of the University's grievance policy. The "substance" of the grievance was that Prokopoff was "misapplying the University's established policy on a Department Executive Officer's [DEO's] 'Project Management Responsibilities' as outlined in Chapter 5 . . . of the Operations Manual[ ]." Defs.' Ex. D. Milman clearly sought to utilize the University's grievance procedures to resolve her problem with Prokopoff. Under *Connick*, were this the extent of the analysis, the Hutchins grievance would not be considered protected speech.

In certain respects, however, the Hutchins grievance did address matters beyond Milman's own personal concerns with the Museum director. She expressed the view that while a DEO's role is mainly to ensure fiscal responsibility, "a DEO does not have any authority over the intellectual content of grant related research and publishing." *Id.* Milman goes on to state that it was her "confirmed opinion that University policy protects the intellectual integrity of any grant funded Principle Investigator's scholarly production." *Id.* In short, Milman expressly raised a valid public issue respecting the authority over the "intellectual content" and "intellectual integrity" of "any grant funded Principle Investigator's scholarly production." That she was a "Professional and Scientific" employee (and therefore not a tenured academic at the University) does not undercut her right to raise questions of control

8. There is a third element, causation, that is relevant to the free speech analysis, though in this case that element is not the focus of the present motion. Under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), Plaintiff must show her speech was a "substantial" or "motivating" factor in the Defendants' deci-

sion to engage in retaliatory actions. *Id.* at 287, 97 S.Ct. 568; *see also Ingram v. Johnson*, 187 F.3d 877, 879 (8th Cir.1999). The question of causation is for the jury. *See Southside Pub. Sch. v. Hill*, 827 F.2d 270, 274 n. 13 (8th Cir.1987). Defendants deny that this third element is met, though on this record the trier of fact could conclude otherwise.

over intellectual content with her supervisor without fear of recrimination. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (public school teacher's free speech claim under *Pickering* not defeated by the fact he did not have tenure); *Griswold v. Connecticut,* 381 U.S. 479, 482–83, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (freedom of speech "includes … the freedom of the entire university community").

There is an additional public dimension to the Hutchins grievance. Milman's dispute over the control of "intellectual content" of a brochure was made with reference to an NEA-funded project which, as the Court has noted above, consolidated the University's ATCA Collection. In the ATCA grant application submitted by the Museum, a representation is made to the NEA that Milman was to play a pivotal, if not lead, role in the presentation of the ATCA exhibitions (of which the Hutchins Exhibit was one part). In question six (6) of the ATCA grant application, the NEA requested the following information: "In the space below, please describe the qualifications of the individual(s) who will be responsible for this project. If there is a publication planned, please describe qualifications of authors." Defs.' Ex. C. In its typed response, the Museum began by stating:

> The exhibition series will be directed by Estera Milman, Founding Director of Alternative Traditions in the Contemporary Arts, Adjunct Associate Professor, The History of Contemporary Art, The University School of Art and Adjunct Curator, UIMA. She will supervise the publications planned to accompany each exhibition.

*Id.* The Museum's response then summarized Milman's expertise in this area, stressing her work as curator of past exhibits and editor and "author of numerous texts on the subject of Dada, FLUXUS and the avant garde." *Id.* Although the ATCA grant application contemplated a supporting cast,[9] it appears the application gave Milman a principal role in the overall ATCA series. It is not until the last line of the Museum's response to question six—wherein it states that "Dr. Stephen Prokopoff, Director, UIMA, will serve as general consultant to the project," *id.,* that Prokopoff receives his first and only mention in the entire ATCA grant application.

Thus, to the extent the ATCA project (and therefore the Hutchins Exhibit) was sold to the NEA on the premise that Milman was to "direct" the ATCA exhibitions and "supervise" its related publications, then the Hutchins grievance is a complaint that Prokopoff's actions were in conflict with these express promises made to the NEA in the grant application. Whether or not Milman was correct in her assertion that she had the authority to make editorial decisions regarding a brochure seems beside the point for purposes of the First Amendment analysis. Although couched clearly in the form and language of an employee grievance, Milman expressed an opinion suggesting that a state official was not properly discharging his duties pursuant to both University policy and a federally-funded grant. Therefore, this is a grievance embracing speech that is both personal and public. *See Cox,* 790 F.2d at 673 (teacher grievance about internal personnel policies and educational policies was a matter of public concern because it addressed the ability of school officials to "discharge *** the public function of education") (quoting *Roberts v. Van Buren Pub. Sch.,* 773 F.2d 949, 956 (8th Cir.1985)) (asterisks in original). The fact she expressed her concerns privately in a grievance letter to her employer cannot operate

9. Museum curator Pam Curran was to "work with Milman on curatorial matters." Defs.' Ex. C. Dr. Dudley Andrew was to "address those issues involving film" and "facilitate the presentation of special programming to ac-company a number of exhibitions." *Id.* Joan Huntley was to "create specially formatted interactive CD ROMs to accompany each exhibition." *Id.*

to disqualify her from the protections of the First Amendment. *See Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (freedom of speech guaranteed by the First Amendment is not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public"); *Campbell*, 155 F.3d at 950. Nor does it matter that the Hutchins grievance indirectly touched on a matter of public concern. *See Connick*, 461 U.S. at 146, 103 S.Ct. 1684 (protected speech "relat[es] to *any* matter of political, social, or other concern to the community") (emphasis added); *Shands v. City of Kennett*, 993 F.2d 1337, 1343 (8th Cir.1993), *cert. denied*, 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994), (speech that addresses a matter of public concern even in a "tangential, attenuated manner" is still subject to the *Pickering* balance). Although this is a very close case, the Court finds that the Hutchins grievance, while clearly expressed in the language and form of an internal grievance, implicates, however indirectly, matters of public concern and is therefore protected speech.

■ The Court turns now to the speech embodied in the Doom grievance sent to Vice Provost Knight on or around May 5, 1998.[10] Milman wrote the letter, it may be recalled, after Prokopoff rather dramatically suspended the Doom Exhibit. In substantial part, Milman's May 5, 1998 letter stated:

Dear Vice Provost Knight.

I am writing to present a grievance against Stephen Prokopoff, my immediate supervisor and the Director of the Museum of Art. I am writing pursuant to III–28.4g of the University Operations Manual. . . .

I am aggrieved by Mr. Prokopoff's interpretation of University policies relating to gifts, grants and contracts; . . . My difficulties with Mr. Prokopoff in this regard are on-going. The immediate events giving rise to the grievance are: 1) Mr. Prokopoff's deletion of my text for the catalogue for the [NEA] sponsored Alice Hutchins exhibition on March 6, 1998, 2) Mr. Prokopoff placing all of my grants "on hold," and insisting that "it was not clear to [him] what [my] role would be in any of these exhibitions" on March 10, 1998, 3) Mr. Prokopoff threatening, on March 10, 1998, to "commission a text for someone else" for my NEA and U of I Cultural Affairs Council funded (and "Global Focus: Human Rights 98" affiliated) "NO!art and the Aesthetics of Doom" project and his announcing that he would make the decisions as to the NO!art exhibition (including selection of works and whether or not I could accompany him on my scheduled research trip to New York City), and 4) Mr. Prokopoff announcing that the [Doom Exhibit] was "postponed" and that a new date was "uncertain" on March 17, 1998.

I wrote Mr. Prokopoff a letter of March 9 outlining policy issues. Mr. Prokopoff made clear in the two meetings we had . . . that he believes he has complete programmatic and fiscal control over all my grants, despite language in V–5.3 [of the University Operations Manual] to the contrary. ***

The remedy I request is clarification of the policy as to project management as it affects my grants and the Museum of Art. Because conflicts continue to arise as to such matters as catalogue text, I request the assistance of the Provost's Office in identifying a mechanism by which such conflicts might be ad-

---

**10.** For purposes of the First Amendment analysis, Defendants consider Plaintiff's Doom grievance irrelevant. It is clear, both from the amended Complaint and Milman's resistance brief, that the alleged protected speech incorporates both grievances. Thus, reading the record in the light most favorable to Milman, the Court is obligated to make reference to both grievances in analyzing the First Amendment issues.

dressed and resolved. [Signed Estera Milman].

Defs.' Ex. E.

After examining the Doom grievance and the ensuing communications between University officials and Milman,[11] the Court finds that Milman's speech again concerns both private and public matters. Viewed narrowly, the letter represents an employee grievance directed against a supervisor concerning the postponement of an art exhibit. Properly viewed, however, the letter raises questions bearing on academic freedom and how state officials discharge their duties.—all matters of public concern.

First, Milman's repeated complaints regarding (1) the "deletion of my text"; (2) "placing all of my grants 'on hold'"; (3) "threatening ... to 'commission a text for someone else' for [the] Doom project"; (4) "[Prokopoff] mak[ing] the decisions as to [Doom] (including selection of works)"; and (5) "postpon[ing]" the Doom Exhibit carry over her earlier protests about control over intellectual content. As the Court concluded above, questions concerning the authority to control the intellect content of text involve matters of public concern. Here, these concerns are brought into sharper focus by the second grievance. By all accounts, Doom was to be a major public art exhibition bringing together a wide array of artists and their work from an important era of American history. Planned to coincide with the University's celebration of the anniversary of the Universal Declaration of Human Rights, Doom was to run for nearly two months and be seen by over 100,000 people. It can hardly be maintained that Milman's speech protesting Prokopoff's unilateral decision to table the show involved "a *mere* internal office grievance." *Cox*, 790 F.2d at 673. A similar sentiment was expressed in *Burnham v. Ianni*, 119 F.3d 668 (8th Cir.1997) (en banc), wherein the Eighth Circuit held that a dispute over the abrupt cancellation of a military history exhibit at a university was more than just an employee grievance: "The history exhibit, displayed for public viewing, was intended, at least, to inform the University and surrounding community of the views and specialties of the history department and its faculty. As such, the speech involved more than a mere internal office grievance." *Id.* at 679 (citing *Cox*, 790 F.2d at 673). Although *Burnham* involved a content-based cancellation of an exhibit, that case does underscore how public interest values, almost by necessity, attach to displays which, as here, are to be "observed by hundreds, if not thousands of people." *Id.* at 671.

Second, Milman's grievance clearly takes issue with Prokopoff's unilateral suspension of the Doom Exhibit, thereby calling into question how University officials discharge their duties pursuant to the University's own guidelines related to grants and the strictures of a federal funding agency. Prokopoff's actions arguably ran afoul of University procedures relating to DEOs[12] and the terms of a federal grant in which Milman appeared to be given substantial, if not primary, authority regarding the overall staging of the Doom

---

11. Examination of events external to Milman's May 5th letter is consistent with *Connick*'s mandate to scrutinize "the whole record." 461 U.S. at 148, 103 S.Ct. 1684; *see also Southside Pub. Sch. v. Hill*, 827 F.2d 270, 272 (8th Cir.1987) (Court examined teachers' letter sent to the Arkansas State Department of Education *and* the state's subsequent report of an ensuing investigation to find that the teachers were speaking on matters of a public concern).

12. In the University's own guidelines related to "Gifts, Grants, and Contracts," the role of the DEO, here Prokopoff, in the context of externally sponsored awards is limited to the fiscal management of projects. The Project Director, on the other hand, here Milman, in addition to some lesser fiscal discretion, is "responsible for the overall programmatic" direction of the project. *See* Section 5.3 of the University's Operations Manual, Defs.' Ex. B.

Exhibit.[13] Allegations of improper management of art projects funded in part by federal grant money at a public art museum are matters squarely within the realm of the public's concern. *See Cox,* 790 F.2d at 673 (teacher grievance against principal regarding both personnel and educational policy issues were "clearly attempts to inform Dillard [the Principal], and ultimately his superiors, that his actions were interfering with the efficient and proper discharge of the crucial responsibilities of the faculty"); *Southside,* 827 F.2d at 272–73 (court rejected the assertion that teachers who wrote a letter to the state department of education outlining "specific instances of failure" of a district administrator "to follow established procedures" related to a federally funded educational program for handicapped students were "merely asserting a personal grudge or internal grievance over employment and working conditions": teachers addressed a matter of public concern with respect to the quality of education in the community and the observance of federal policy as prescribed by Congress for the welfare of handicapped children.); *see also Pickering,* 391 U.S. at 571, 88 S.Ct. 1731 ("a difference of opinion" regarding the "preferable manner of operating the school system" "clearly concerns an issue of general public interest"); *Allen v. Scribner,* 812 F.2d 426, 431 (9th Cir.1987), *amended by,* 828 F.2d 1445 (9th Cir.1987) (competency of project management as well as efficient performance of project duties constitute matters of public concern); *Johnson v. Lincoln Univ.,* 776 F.2d 443, 451 (3d Cir.1985) (mere fact that an employee's criticism of academic policy is an "outgrowth of his personal dispute" with the school's administration does not prevent some aspect of it from touching upon matters of public concern).

Third, the public import of Milman's Doom grievance is buttressed by the fact that it eventually brought to light, through the correspondence of Vice Provost Knight, the University's apparent intention not to assist in the financial support of the exhibit.[14] In a letter to Milman dated December 21, 1998, Knight stated that the University "has never promised any amount of money to support the No!Art Exhibition, and reiterates that it will not do so." Pl.'s Ex. 1. Two days later, the Associate Director of Sponsored Programs at the University Eugenia T. McGee e-mailed Kevin Ward, Assistant Director of Human Resources for Employee and Labor Relations, and stated:

> Estera came by this morning to discuss the letter she received from Joe Knight regarding among other things the status of her NEA grant for the NO! Exhibition. To say the least, I was shocked and dismayed by Knight's comment that "The University has never promised any amount of money to support the No!Art exhibition, and reiterates that it will not do so." Kevin this is not accurate. I signed off on the Revised budget on 3/2/95 that certified that the UI would contribute the following to this exhibition: [University pledge of $114,130 for salaries, wages, and fringe benefits set forth; University commitment of $201,-400 promised in the "revised budget"; pledges of $57,270 in indirect costs and Museum exhibition budget funds also set forth]. As the Grant Administrator, I do not see how the UI can deny these funds to this project, grievance or no grievance. We are required by law un-

---

**13.** Plaintiff's Exhibit 3, which includes the Doom grant application and related correspondence between the NEA and the University and Museum, is replete with references to Plaintiff and her role as "organizer" and "Project Director." As with the ATCA grant, Milman's prior expertise as curator, author, and editor of past works in the field is prominently noted in the Doom grant. Prokopoff, as Museum director, is listed as an "advisor"

to the exhibit and one of three "supervisors" of the exhibit's *installation.* Pl.'s Ex. 3.

**14.** Although Milman asserts in her amended Complaint that Defendant Whitmore has refused to financially support the Doom Exhibit, nothing in the record ties him to these allegations.

der OMB Circulars A–110 and A–102 to fulfill our cost-sharing obligations unless the NEA agrees to a decrease in cost-sharing based upon a request from the U of I.... I wish [Knight] had contacted me regarding this grant before making claims that potentially violate federal regulations.

Pl.'s Ex. 10. In a follow-up letter to Plaintiff dated January 25, 1999, Knight again addressed the issue of University financial support and apparently reiterated the University's intention not to fund the exhibit. University commitment, Knight wrote, "would include the in-kind commitment of staff, and the appointment of a Research Assistant.... Also, as I mentioned [in] my December 21 letter, while Ms. Milman has previously indicated it would require another $40,000 to stage the exhibition, the University is unable to commit any money beyond its NEA grant commitment at this time." Pl.'s Ex. 2. It is not clear whether Knight's January 25th letter means the University would not commit any money *at all* in support of Doom, or that it would not commit any amount beyond what it already promised. Of course, resolution of that question does not alter the conclusion that Doom grievance and the correspondence it generated raise questions regarding the handling of public funds. That is an issue touching on a matter of public concern. *See Kincade,* 64 F.3d at 396 (speech about the use of public funds touches upon a matter of public concern) (citing *Hamer v. Brown,* 831 F.2d 1398, 1402 (8th Cir.1987) and *Bausworth,* 986 F.2d at 1199 (M.Arnold, J., concurring) ("[S]peech that either directly, or by reasonable inference, criticizes public officials' use of the public's funds lies at the core of the speaker's First Amendment rights.")).

For the above reasons, the Court finds that the Hutchins grievance and the amended Doom grievance touch on matters of public concern and, under *Connick,* are protected speech.

**B. Pickering balance**

■ Because Milman's comments in her original and amended grievance touched upon matters of public concern, the Court must balance Milman's free speech rights against the interests of Defendants as representatives of the state employer. However, if the Defendants fail to make a threshold showing that the speech in fact caused workplace disruption, then the *Pickering* balance is not put in issue. As to the type of showing that must be made, "the government employer must make a *substantial showing* that the speech is, in fact, disruptive before the speech may be punished." *Burnham,* 119 F.3d at 680 (emphasis added) (citing *Waters v. Churchill,* 511 U.S. 661, 673, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)). "[B]are allegations" of workplace disruption, *Kincade,* 64 F.3d at 398, "bald assertions of harm based on conclusory hearsay and rank speculation," *Burnham,* 119 F.3d at 680, or "[m]ere allegations of disruption," *Sexton v. Martin,* 210 F.3d 905, 912 (8th Cir.2000) (citation omitted), are insufficient to put the *Pickering* balance at issue.

Once a minimal showing is made, *Pickering* requires the Court to "balance [Plaintiff's] interest in making her statement against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891 (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731). Under the *Pickering* balancing analysis, the "manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Id.* (citations omitted). "Pertinent considerations [are] whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* (citation omitted).

■ With these principles in mind, the Court finds that Defendants have not met their initial burden to substantially show that Milman's comments were in fact disruptive to the workplace. In his affidavit, Prokopoff states that "Ms. Milman's direct challenge to my authority to perform the functions of my position as Director created disharmony and disrupted normal working relationships in the Museum." Under the authorities cited above, such conclusory assertions plainly do not put the *Pickering* balance at issue.

Knight does not comment on whether or to what extent Milman's speech caused disruptions in the workplace. The only other immediately relevant person to address the issue was Pamela Trimpe ("Trimpe"), currently the Curator of Painting and Sculpture at the Museum. During the times relevant to this lawsuit, she was the Assistant Director of the Museum. Echoing Prokopoff's assertions, Trimpe stated in her affidavit that Milman's grievance "was a direct challenge to her supervisor's authority .... imped[ing] ... her ability to perform her work functions at the Museum." She continues: "In my perception, Ms. Milman's inflexible position concerning editorial control, funding, and galleries for the presentation of certain exhibits, which have been seen by some as threats, have caused great stress and trepidation among various Museum staff members and have impeded the effective operation of the Museum."

Although Trimpe's statements go beyond "bald assertions of harm," they nonetheless fall short of the "substantial showing" that Milman's speech was in fact disruptive. *See Sexton*, at 905 (supervisor's affidavit stating that employee's conduct in reporting the unauthorized tapping of a private phone line "adversely affected department morale because the supervisors were angry—and expressed their anger directly to me—that [plaintiffs] had taken their criticism of the recording of the kitchen line outside the Department's normal chain of command" held insuffi-

cient to trigger the *Pickering* balance). Although Trimpe notes that Milman's inflexible position on issues "caused great stress and trepidation among various Museum staff members," neither she nor Defendants ever identify these "various" staff members, nor detail the "stress and trepidation" they experienced. *Cf. id.* ("a simple assertion by the employer that contested speech affected morale, without supporting evidence," is not enough to put the *Pickering* balance at issue) (citation omitted). By contrast, in *Connick*, the record and testimony of the attorneys in the District Attorney's office supported the characterization that the controversial questionnaire caused a "mini-insurrection." 461 U.S. at 151–52 & n. 11, 103 S.Ct. 1684. Supporting evidence like that is not presented here.

■ Even under a *Pickering* analysis, the Defendants have not shown how Plaintiff's speech has undermined "the effective functioning of the public employer's enterprise"—which is the primary focus in applying the *Pickering* test. *See Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. Defendants assert that Milman's position "usurps" the authority of the Museum Director and the University of Iowa. Milman's conduct, Defendants argue, "directly impacts the harmony in the Museum, demonstrates that she will not accept direction from the Museum Director, and impedes her ability to perform the duties of her position, thereby interfering with the Museum's ability to efficiently and effectively meet its responsibilities to the public." Defs.' Memo. of Law in Supp. of Motion for Summ.J. at 10.

Nothing in the record, save for some conclusory remarks in two affidavits, demonstrates that Milman cannot do her job or accept direction now from her boss. Nor is there any indication that strict codes of loyalty or order should inhere in the relationship between a curator and a museum director to justify punishment of employee speech. *See, e.g., Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684 ("close working re-

lationships" considered "essential" in a District Attorney's office); *Barnard v. Jackson County*, 43 F.3d 1218, 1224–25 (8th Cir.1995), *cert. denied*, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 17 (1995), (even though legislative auditor leaked information to the public regarding misdeeds by individual legislators and was later fired, auditor's lack of "integrity" and "loyalty" to those she served justified punishment); *cf. Cox*, 790 F.2d at 675 ("The teacher-principal relationship is not of such a personal and intimate nature that teachers must be precluded from filing responsible grievances.").

Invariably, when an employee files a grievance directed at an authority figure over workplace issues, there may be tension. But if that were the standard, then hardly any employee grievance filed against a supervisor resulting in retaliation would qualify for First Amendment protection. There is nothing in the record, beyond unsupported allegations, to suggest that the "time, place, or manner of [Milman's] speech aggravated her relationship with [Prokopoff] or impeded the normal operation of the [Museum]; nor is there a suggestion that her individual grievance or criticisms throughout the year were intemperate, or antagonistic." *Cox*, 790 F.2d at 674 (citations omitted). In fact, the record demonstrates Milman proceeded tactfully and professionally in pressing her grievance. Similar observations would apply with greater force to Defendants Knight and Whitmore.

## IV. Conclusion

For the foregoing reasons, the Court holds as a matter of law that Plaintiff, through a set of grievances filed against her supervisor, has expressed statements that touch upon matters of public concern, which statements merit First Amendment protection.[15] Second, the Court holds as a matter of law that Defendants have not made a "substantial" showing of workplace disruption sufficient to trigger the *Pickering* balance. Even if the *Pickering* test were applicable, Plaintiff's liberty interest in filing her grievance, on balance, would outweigh any alleged impairments or disruptions at the Museum.

With respect to Defendants Prokopoff and Knight, Defendants' Motion for Summary Judgment is **DENIED**. With respect to Defendant Whitmore, Defendants' Motion for Summary Judgment is **GRANTED**.

Additionally, as stated in footnote one of this Order, Plaintiff's cross motion filed February 9, 2000 is **DENIED**; Plaintiff's motion filed May 2, 2000 (Clerk's # 52) is **DENIED**.

**IT IS SO ORDERED.**

---

15. Because the Court holds the underlying grievance to be protected speech, the Court declines to pass on Plaintiff's alternative argument that the very act of filing a grievance is a protected right under the First Amendment. *See San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir.1994).